# DAVID RICHARD STANLEY *v.* STATE OF MARYLAND

[No. 58, September Term, 1973.]

*Decided January 2, 1974.*

508

The cause was argued before MOYLAN, POWERS and GILBERT, JJ.

*Nelson R. Kandel*, with whom was *Leslie L. Gladstone* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *L. Robert Evans, Deputy State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

*Spinelli v. United States,* 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969), purported "to explicate" *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964). *Spinelli* is not itself without some need of explication. The precise influence of *Spinelli* upon *Aguilar* and the murky relationship to both of *Draper v. United States,* 358 U. S. 307, 79 S. Ct. 329, 3 L.Ed.2d 327 (1959), govern our review of the conviction by a Baltimore County jury, Judge H. Kemp MacDaniel presiding, of the appellant, David Richard Stanley, for the possession of heroin.

The sufficiency of the incriminating evidence is not in dispute. When the appellant was arrested at 8:30 p.m. on July 3, 1972, two glassine bags of heroin were found beneath the driver's seat of the vehicle which he had been operating until the moment of arrest. Our decision hangs upon the validity of that search and seizure. The Baltimore County Police were operating without a warrant, upon ostensible probable cause to believe that the appellant was selling heroin from his automobile. The probable cause ran to both the person and the vehicle.

If the police did, indeed, have probable cause, the search

and seizure in issue was reasonable upon either of two distinct exceptions to the warrant requirement. That postulated probable cause, in conjunction with what we deem to have been ample exigency, would have justified a warrantless search of the vehicle under the so-called "automobile exception." *Carroll v. United States*, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *Chambers v. Maroney*, 399 U. S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970); *Coolidge v. New Hampshire*, 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971); *Mobley v. State*, 270 Md. 803, 310 A. 2d 803; *King and Mobley v. State*, 16 Md. App. 546, 298 A. 2d 446; *Soles v. State*, 16 Md. App. 656, 299 A. 2d 502; *Peterson v. State*, 15 Md. App. 478, 292 A. 2d 714; *Bailey v. State*, 16 Md. App. 83, 294 A. 2d 123; *Skinner v. State*, 16 Md. App. 116, 293 A. 2d 828. That same postulated probable cause would, quite independently, have justified a warrantless arrest of the appellant, Art. 27, Sect. 594B, and, the unities of time and place having been in our judgment adequately established, *Chimel v. California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969); *Brown v. State*, 15 Md. App. 584, 292 A. 2d 762, the search beneath the seat where the appellant had been seated when arrested scant seconds before, would have been a legitimate "search incident" to that arrest. *Peterson v. State, supra*, at 15 Md. App. 481-493; *Howell v. State*, 18 Md. App. 429, 306 A. 2d 554. Both State theories, it is therefore quite clear, depend upon the adequacy in the first instance of the probable cause.

The probable cause consisted of minimal direct observations by the arresting officer coupled with significantly incriminating hearsay from an anonymous police informant. Our problem, upon our constitutionally mandated independent review, *Ker v. California*, 374 U. S. 23, 34, 83 S. Ct. 1623, 10 L.Ed.2d 726, 738 (1963), is, as was the problem of the trial judge upon the motion to suppress, to evaluate that hearsay—to determine whether it was an appropriately trustworthy predicate for the Fourth Amendment intrusion.

In that regard, it is established that the guidelines for the

evaluation of hearsay information in a probable cause setting are the same whether a magistrate is contemplating the issuance of a warrant or whether a trial judge is weighing the propriety of a policeman's actions without a warrant. *Wong Sun v. United States,* 371 U. S. 471, 479-482, 83 S. Ct. 407, 9 L.Ed.2d 441, 450-452 (1963); *Beck v. Ohio,* 379 U. S. 89, 93-97, 85 S. Ct. 223, 13 L.Ed.2d 142, 146-148 (1964); *McCray v. Illinois,* 386 U. S. 300, 87 S. Ct. 1056, 18 L.Ed.2d 62 (1967); *Spinelli,* at 393 U. S. 417, n. 5; *Mobley v. State, supra; King and Mobley v. State, supra,* at 16 Md. App. 554-557; *Schmidt v. State,* 17 Md. App. 492, 302 A. 2d 714; *Thompson v. State,* 16 Md. App. 560, 298 A. 2d 458; *Soles v. State, supra,* at 16 Md. App. 660-665; *Bauckman v. State,* 9 Md. App. 612, 267 A. 2d 309; *Green v. State,* 8 Md. App. 352, 259 A. 2d 829. *Cf. Taylor v. State,* 238 Md. 424, 209 A. 2d 595. In applying the strictures of *Aguilar* to a warrantless arrest based upon an informant's hearsay, former Chief Judge Murphy said for this Court in *Bolesta v. State,* 9 Md. App. 408, 264 A. 2d 878, at 9 Md. App. 412:

> "Where the arrest is initiated on hearsay information received from an informant, the State to establish its legality where challenged should sufficiently inform the trial judge of some of the underlying circumstances from which the informant concluded that a crime was being or had been committed by the person to be arrested, and some of the underlying circumstances from which the police concluded that the informant was credible or his information reliable. See *Spinelli v. United States,* 393 U. S. 410, and *Mullaney v. State, supra* [5 Md. App. 248] at page 254."

In undertaking then the evaluation of the hearsay information furnished to the arresting officer by the informant at bar, we follow the procedure set out in *Spinelli,* at 393 U. S. 415:

> "The informer's report must first be measured against *Aguilar*'s standards so that its probative value can be assessed."

512

### The "Veracity" Prong

We will look first to the "veracity" prong of *Aguilar*'s "two-pronged test" to determine whether there was furnished sufficient "underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . ., was 'credible' or his information 'reliable'." *Aguilar*, at 378 U. S. 114.

We are persuaded that the informant was "credible." Detective Robert Oatman testified, at the suppression hearing outside the presence of the jury, as to the following knowledge about his informant:

> "Your Honor, on 6/4/72 the reliable informant was made reliable by myself and Detective Minnerly. I went to a certain location and met the informant. At this time the subject was searched and found to be free of any narcotics and any money whatsoever. He was given a ten dollar bill and observed to walk into a home on Propeller Court in the Essex District, at which time he purchased a ten dollar amount of marihuana. He returned to the police unit where again he was searched and found to be free of the ten dollar bill given to him. He was also free of any narcotics. At this time he turned over the suspected marihuana to the Crime Lab and it was found to be marihuana, a controlled dangerous substance."
>
> . . . .
>
> On 6/15/72, again the same reliable informant, 077, supplied our Department and myself with information involving the arrest of two subjects and the confiscation of 43 pounds of marihuana. This case is pending in Baltimore City. On 6/28/72 the same reliable informant, 077, supplied myself with information that led to the arrest of six subjects and the confiscation of 68 pounds of marihuana."

This represents a highly commendable type of detail which enables a reviewing trial court to make a truly informed

judgment as to the credibility of a source of information rather than be asked to ratify a policeman's conclusion in that regard. It is, under the circumstances, superfluous even to consider the buttressing effect, under *Spinelli*, of certain independent police verifications. *Aguilar*'s "veracity" prong is already satisfied with flying colors, upon the basis of the internal description itself.

### The "Basis of Knowledge" Prong

Such is not the case, however, with *Aguilar*'s "basis of knowledge" prong. The trial judge was not furnished "the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were." Detective Oatman's testimony in this regard was unenlightening:

"[H]e stated at this time one, David Stanley, would be operating a 1964 yellow Chevrolet and he would have in his possession Cocaine and Heroin. The informant stated the Stanley subject would be in the Dundalk area near the pool hall between the hours of eight o'clock and 8:30. At this time he would also be accompanied by another white male subject by the name of Walter Holak."

There was no direct indication that the informant spoke from personal knowledge — no assurance that he arrived at his conclusion on the basis of that which he had seen with his own eyes or heard with his own ears — no direct elimination of the possibility that he was a mere conduit for information from yet a third party if not, indeed, for information no "more substantial than a casual rumor circulating in the underworld." *Spinelli,* at 393 U. S. 416.

The hearsay at bar was, therefore, initially hung up on *Aguilar*'s "basis of knowledge" prong. The trial judge was not informed as to what the informant based his conclusion upon — as to how the informant came upon his information. "To permit the informant, no less than to permit the affiant, to offer an unsupported conclusion, would be to usurp the [judicial] function, which the Fourth Amendment forbids." *Dawson v. State,* 14 Md. App. 18, 31, 284 A. 2d 861.

We would ordinarily now proceed to a routine examination of the "basis of knowledge" prong under *Spinelli's* augmentation to *Aguilar's* analysis to see if the information coming *from* the informant was furnished in such detail — "self-verifying" detail — as to permit the reasonable inference that the informant spoke from firsthand knowledge. *Spinelli,* at 393 U. S. 416-417; *Soles v. State, supra,* at 16 Md. App. 660-665.

### A Suggested Reinforcement and a Suggested Alternative

The State, however, strenuously urges upon us that it has an alternative arrow (or two) in its constitutional quiver — a perplexingly undifferentiated reliance upon *Spinelli* and *Draper,* citing independent verification as a significant factor. We hold that reliance to be misplaced. There is, to be sure, however, an elusive quality to the general notion that makes it difficult to pinpoint precisely where it goes astray. The chameleon-like thesis of diffuse and non-particularized reliance has appeared before, both here and elsewhere. The alarming frequency with which "fuzzy" law is being advocated (and sometimes judicially promulgated) in this Fourth Amendment area, merits that an effort at clarification at least be made.

The testimony at bar on the issue of probable cause contained, in addition to the hearsay, a few direct observations of Detective Oatman made just before the arrest was consummated. Detective Oatman drove to Dundalk and set up an observation post across the street from the pool hall. His observations consisted of the following: 1) at approximately 8:20 a yellow Chevrolet drove up to the intersection of Baltimore Avenue and Dundalk Avenue, just across from the pool hall; 2) the appellant was behind the wheel; and 3) Walter Holak was a passenger.

On the basis of those observations, the State posits a general reliance upon the precedent of *Draper* as providing "a substantial basis for crediting the hearsay" and, alternatively, a specific reliance upon the "independent police verifications" — buttressing technique described in

*Spinelli*. Our examination and review of the State's thesis will be, of necessity, on two separate planes. Our first responsibility is to try to dispel the insidious and recently growing myth that some diffuse "substantial basis" test — growing out of *Draper* and *Jones v. United States*, 362 U. S. 257, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960), invigorated by the rhetoric of *United States v. Ventresca*, 380 U. S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965), and sanctioned by *United States v. Harris*, 403 U. S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971) — is now abroad as a distinct and alternative hearsay trustworthiness test to the traditional analysis of *Aguilar* and *Spinelli*. Hopefully having laid that ghost to rest, we will then measure the State's thesis against the accepted standard of *Aguilar* and *Spinelli*.

### *"Substantial Basis": Synonym or Alternative?*

Without critical analysis of the hearsay evaluation problem as such, *Brinegar v. United States*, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879, in 1949 accepted hearsay as a legitimate factor in determining whether a policeman had probable cause for the warrantless search of an automobile. A decade later, *Draper*, again not addressing itself significantly to a qualitative analysis of receivable hearsay, nevertheless treated hearsay as a legitimate factor in the amassing of probable cause for a warrantless arrest. *Jones*, in 1960, was the first Supreme Court decision to deal with hearsay in a warrant application and was the first decision ever to face squarely the fundamental issue of whether hearsay should or should not be received in a probable cause setting. It ruled unequivocally that hearsay was not only appropriate to be received by a magistrate on the issue of probable cause but that it could be sufficient, standing alone, to establish such probable cause. Justice Frankfurter, writing for the Court, did not give it carte blanche, however; he cautioned that it could serve as the predicate for a warrant "so long as a substantial basis for crediting the hearsay is presented." *Jones*, 362 U. S. at 269. *Jones* did not undertake to spell out what "a substantial basis for crediting the hearsay" would be.

That office fell, four years later, to *Aguilar*.[1] The so-called "two-pronged test," whereunder "the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable' " was, indeed, the fleshing out of the earlier phrase "a substantial basis for crediting." There was no conflict or tension between *Aguilar* and *Jones*. *Aguilar* explicitly built upon the foundation of *Jones*. It analyzed the facts of *Jones* at great length, at 378 U. S. 114-115, n. 5, and showed how the hearsay in *Jones* would have passed muster by the more fully articulated standards of *Aguilar*.

In *Jones*, the informant related explicitly that he had "on many occasions . . . gone to said apartment and purchased narcotics drugs from the above mentioned persons and that the narcotics were secreated [sic] in the above mentioned places," to wit, "either on their person, under a pillow, on a dresser or on a window ledge in said apartment." Even anticipatorily, *Jones* met every demand of *Aguilar*'s "basis of knowledge" prong. The informant saw with his own eyes and heard with his own ears.

Similarly, *Jones* satisfied *Aguilar*'s "veracity" prong. The affiant recited that his "source of information" had "given information to the undersigned on previous occasions and which was correct." The affiant pointed out further, on the issue of "veracity," how "other sources" had given similar information to both the affiant and to other officers of the Narcotics Squad. Most significantly, in terms of independent verification, the affiant was personally familiar with both suspects and recited that "Both have admitted to the use of narcotic drugs and display needle marks as

---

1. Three months before *Aguilar*, the Supreme Court had decided *Rugendorf v. United States*, 376 U. S. 528, 84 S. Ct. 825, 11 L.Ed.2d 887 (1964), affirming a finding of probable cause partially on the basis of hearsay from police informants. The focus of the case, however, was upon the disclosure of the identity of an informant and not upon the quality of the hearsay itself or upon the required showing of trustworthiness as a basis for crediting the hearsay.

evidence of same." A careful reading of *Jones* simply will not support the proposition that "a substantial basis for crediting the hearsay" under *Jones* means anything different from or less than the "two-pronged test" of *Aguilar*.

The same is true of *Draper*. Even if one could accept the dubious notion that an earlier and more primitive case could ever overrule later and more fully developed cases, *Draper* simply would not erode *Aguilar-Spinelli* but would pass muster according to them. The informant in *Draper* — "one Hereford" — was not even anonymous; he was named. It was, furthermore, recited about him that he "had been engaged as a 'special employee' of the Bureau of Narcotics at Denver for about six months, and from time to time gave information to Marsh [the affiant] regarding violations of the narcotic laws, for which Hereford was paid small sums of money, and that Marsh had always found the information given by Hereford to be accurate and reliable." *Draper*, at 358 U. S. 309. In addition, four of the five details passed on to the affiant by Hereford were independently verified by direct police observations. Under the circumstances, his "veracity" was amply established by the most rigorous *Aguilar-Spinelli* testing. As to Hereford's "basis of knowledge," he did not, to be sure, explicitly establish "how he came by his information." The teaching of *Spinelli*, however, using *Draper* as its illustrative "benchmark," is that where the information has been furnished by the informant in sufficient detail — what *Spinelli* refers to as "self-verifying detail" — firsthand knowledge may be implicit.[2] Thus, *Draper* also is an unsound base for the

---

2. "A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way." *Spinelli*, at 393 U. S. 417. "Detailed information may sometimes imply that the informant himself has observed the facts ... [I]t is arguable that on these facts it was the informant himself who has perceived the facts, for the information reported is not usually the subject of casual, day-to-day conversation. Because the informant is honest and it is probable that he has viewed the facts, there is probable cause for the issuance of a warrant." *Spinelli*, at 393 U. S. 425-426 (concurring opinion by White, J.)

And see *Soles v. State, supra,* at 16 Md. App. 660-665; *Dawson v. State, supra,* at 14 Md. App. 31-32, n. 5.

proposition that the Supreme Court will accept hearsay in a probable cause setting according to some vague alternative standard different from and less than the accepted *Aguilar-Spinelli* one.[3]

Nor may the proponents of some looser, alternative standard take more than momentary comfort from *Ventresca*, decided one year after *Aguilar.* Ignoring its facts and, therefore, its solid holding, they grasp (very selectively) at its rhetoric that courts "should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Ventresca* cited *Aguilar* with approval and analyzed its own facts to demonstrate its solid compliance with *Aguilar.* Indeed, the full paragraph from which the "don't be hypertechnical" language is so frequently pulled affirms that the oft-quoted directive comes into play only after *Aguilar*'s standards have first been met:

> *"This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. . . . Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.* However, *where these circumstances are detailed, where reason for*

---

**3.** See the illuminating Comment, *The Informer's Tip as Probable Cause for Search or Arrest,* 54 Cornell L. Rev. 958 (1969), at 964, n. 34:

> *"Draper,* a warrantless case decided before *Aguilar,* held that there was probable cause because (1) the informer had given accurate information in the past and (2) four of the five facts alleged by the informer were corroborated by the FBI agent before making the arrest. The *Draper* Court appeared to treat both factors as reasons for believing the informer reliable but showed no visible concern with a basis of knowledge test. Thus, *Draper* is arguably incompatible with *Aguilar,* but the *Draper* opinion is really too brief to indicate the Court's reasoning. In *Spinelli,* both Justices Harlan and White believed the *Draper* tip contained self-verifying detail sufficient to infer an adequate basis of knowledge. Thus, under *Spinelli,* the *Draper* decision is sound as applied to its facts."

*crediting the source of the information is given,* and *when a magistrate has found probable cause,* the court should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. . . ." 380 U. S. 108-109. (Emphasis supplied.)

The hearsay information in *Ventresca* passed traditional muster.[4] Even *Harris* pointed up the fundamental compatibility of *Aguilar* and *Ventresca.* After quoting at length from *Ventresca's* urgings to be "practical and not abstract" and its inveighings against the "technical requirements of elaborate specificity" and "the grudging or negative attitude by reviewing courts," *Harris* noted: *"Aguilar* in no way departed from those sound principles."

The last redoubt of the "looser alternative" advocates is *Harris,* but again the case won't hold the weight of the argument based upon it. Even if one were to accept the mere plurality opinions of four justices, three justices and four justices, respectively, for the three stated principles of *Harris* as the "law of the land,"[5] no damage is done to

---

**4.** The analysis of the case in Comment, *The Informer's Tip as Probable Cause for Search or Arrest,* 54 Cornell L. Rev. 958 (1969), is instructive, at 961:

"The opinion indicates that the affidavit, viewed realistically, passed each of the *Aguilar* tests. Since IRS investigators are presumed to be truthful, a statement that information came from IRS investigators satisfies the reliability test. The basis of knowledge test is met because at least some of the information was stated to be derived from the observations of other investigators, and the smell of mash and sounds of a motor were explicitly stated to be personal observations of investigators."

**5.** But see *Baker, Whitfield & Wilson v. State,* 15 Md. App. 73, 77-78 and 82-83, 289 A. 2d 348, and particularly the words of Chief Judge Orth at 15 Md. App. 82:

"That opinion is therefore not that of the Court and because it is not the opinion of the Court none of its findings, conclusions and views are constitutionally the 'Supreme Law' of Maryland nor are the

*Aguilar* and the most minor adjustment is made to *Spinelli*. In the first place, the informant in *Harris* explicitly spoke from firsthand knowledge. The informant personally purchased the untaxed whiskey from the suspect on the suspect premises and made a significant number of firsthand observations. The plurality, concurring and dissenting opinions unanimously agreed that *Aguilar's* "basis of knowledge" prong was preeminently satisfied. That was simply no issue in the case.

Nor was there any disagreement with the fundamental requirement that the other — the "veracity" — prong must also and independently be satisfied. Even the plurality opinion agreed that "a bare statement by an affiant that he believed the informant to be truthful would not, in itself, provide a *factual* basis for crediting the report of an unnamed informant." 403 U. S. at 579. The informant in *Harris* had no "track record" of demonstrated past "veracity". In issue were the alternative means by which his "veracity" might be established. The debate in *Harris* was not over the fundamental question of whether an informant's "veracity" must be established, but only over the subsidiary question of the means by which it could be shown.

The *Harris* plurality set out to bolster the first-time informant's "veracity" by showing two items of independent corroboration and by showing that the "tip" was a declaration against penal interest.[6] The only peripheral collision between *Harris* and *Spinelli* was over the legitimacy of considering the suspect's reputation with the

---

'Judges of this State, and all the People of this State * * * bound thereby.' In other words, the opinion of the plurality of four Justices is no more controlling in this State than is the dissenting opinion of the three Justices."
And see *Dawson v. State, supra,* at 14 Md. App. 24-25, n. 1.

**6.** One possibly profitable alternative rationale was strangely not explored. It would appear that the informant in *Harris,* although having broken the law by buying untaxed whiskey, was not a regular or typical police informer "from the criminal milieu." He might have been deemed —as a mere customer—at least part-way along the road toward the cleaner and inherently less suspect category. of "citizen-informer." See *People v. Glaubman,* 485 P. 2d 711.(Colorado, 1971).

police as one of the corroborative factors.[7] The other corroborative item — that a constable "located a sizeable stash of illicit whiskey in an abandoned house under Harris' control" at some time within the past four years — would have been credible under *Spinelli*, with only its weight in issue, fluctuating presumably with the freshness or staleness of that earlier encounter. The quarrel between the Burger plurality opinion and the Harlan dissent over declarations against penal interest was over a point not considered by or involved in either *Aguilar* or *Spinelli*.[8]

---

7. The two cases could be distinguished as *Harris* tried to do. The reputation discounted by *Spinelli* was that of the suspect being "a known gambler," with no basis given for that assertion. In *Harris*, the bad reputation in question arguably took on more substance from the fact that it had persisted for "four years" and sprang, furthermore, from rural soil rather than from the faceless anonymity of an urban swarm. The affiant further buttressed the reputation in question with "numerous information from all types of persons as to his activities" as well as recounting that a "sizeable stash" of contraband had been recovered on an earlier occasion from the suspect premises by a fellow constable. The distinction between the bald and unilluminating statement as to reputation, on the one hand, and the better substantiated reputation, on the other hand, may be valid, in which case even the peripheral conflict between *Harris* and *Spinelli* disappears. The Harlan quarrel, in dissent, with the Burger plurality, was not so much with the relevance of a criminal reputation, as such, but rather with the loose and questionable means of establishing that reputation.

8. Even here, the difference between the two positions may well be more apparent than real. The Harlan dissent did not so much quarrel with the general proposition that a genuine declaration against penal interest would be some guarantee of trustworthiness, but only with the application of that principle to the typical paid and protected police "stool pigeon," whom the courts have always treated with a healthy skepticism as inherently suspect. The Burger position, on the other hand, does not necessarily espouse the application of the general principle in the indiscriminate fashion condemned by Harlan, since the only informant under examination in *Harris* would not seem to have been, as a customer for bootleg whiskey, a typical police "stool pigeon." The quarrel may well, therefore, not be over the general principle itself but simply over the factual question of which tips furnished by which informants under which circumstances are, in truth, genuine declarations against penal interest. See McCormack, *The Law of Evidence*, § 256 (1954). The literal holding of even the plurality opinion, therefore, is not nearly as frightening or as inconsonant with earlier decisions as is the unnecessarily broad language of Chief Justice Burger.

The fallacious doctrine which some now read into this section of the *Harris* opinion would put a premium on informants "from the underworld milieu" and would treat them as more credible than the disinterested "citizen-informers". Maryland has firmly rejected such an absurdity in the sound analysis of Chief Judge Murphy in *Mobley v. State, supra*, at 270 Md. 76:

"We are in full agreement . . . that a different rationale exists for establishing the reliability of citizen-informers than for establishing that of the more suspect and anonymous police

522

Thus, even though *Harris* may have used the words "substantial basis," we read those words — dealing as they do, in the full context of the case, with two corroborative items and a declaration against penal interest as providing "a substantial basis for crediting" the informant's report — not as devising some new and alternative test to *Aguilar-Spinelli* but simply as describing an operating procedure within the framework of *Aguilar* [9] and *Spinelli*. [10]

The cases themselves are reconciled and rumors of their estrangement, ill-founded. There is simply no "substantial-basis-for-crediting" or "totality-of-circumstances" alternative test. [11] Those who posit a looser approach offer not an alternative analysis but only a flight from analysis. One standard still prevails for the evaluation of hearsay information in a probable cause setting. [12] We will now proceed to an examination of the State's argument against that traditional standard.

informer; and 'that the strictures of *Aguilar v. Texas* . . . and *Spinelli v. United States* . . . are aimed primarily at unnamed police 'informers' rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime, other disinterested civilian sources of information or other law enforcement officers.' "

**9.** The "substantial basis for crediting" language came, of course, from *Jones*. *Harris* took pains to point out, "Significantly, the Court in *Aguilar* cited with approval the affidavit upheld in *Jones*." 403 U. S. at 578. Even *Harris* does not consider *Aguilar* and *Jones* to be traveling separate routes.

**10.** Realistically, the quarrel that even the "looser alternative" advocates have with *Spinelli* seems to be not with the analytical framework of *Spinelli* as such but only with the application of that analysis to its own facts. Conversely, the defenders of the *Spinelli* analysis, as an efficient gauge, could well differ with the Supreme Court's verdict, as constitutional fact finders, that the police observations in the *Spinelli* case were inadequate to verify the informant's "veracity". One could easily reach an opposite verdict on the facts of *Spinelli* without wishing to alter one whit its analytical framework.

**11.** Though some lament *Aguilar-Spinelli* as "confusing," we must note that it is far less confusing to have one test in the field than to suffer two conflicting and inconsistent tests operating simultaneously. The complexity, moreover, stems not from the cases themselves but from the inherent, immemorial difficulty of the hearsay concept itself.

**12.** The critics of the "guidelines" fail to appreciate that it took the better part of two centuries for the common law to hammer out the hearsay rule and its various and numerous exceptions in a trial setting. V *Wigmore on Evidence* (3rd Ed., 1940), §§ 1360, 1420, 1421, 1422 and 1427. That some growing pains are inevitably being experienced, as we evolve analogous guidelines for the reception of hearsay in a probable cause setting, is not to be unexpected.

### The Distinct Therapeutic Devices of Spinelli

The State urges that the independent police observations bolster, under *Spinelli*, the initially inadequate satisfaction of *Aguilar*'s "basis of knowledge" prong. Anything less than a scrutinous reading of *Spinelli* encourages such a position. The confusion and the misreading are, moreover, understandable. A word is in order as to where and why analysis so frequently goes awry.

The "two-pronged test" of *Aguilar* put the State to the task of answering satisfactorily two very separate questions for two very separate purposes. *Spinelli* devised (or at least enunciated) substitute means for satisfying those demands where the direct initial efforts had proved unsuccessful. *Aguilar* listed two distinct structural flaws that might inhere in hearsay-based probable cause; *Spinelli* designed two distinct buttressing techniques to shore up the hearsay against those flaws. Chaotically, however, the national case law is now replete with the undifferentiated application of either *Spinelli* remedy to either *Aguilar* defect. The analysis has not been clean.[13]

With two very differing ailments — faulty narration and faulty perception — in our pathology, and two very differing remedies — truth serum and bifocal lenses — in our pharmacopoeia, we need above all to be discriminating. The State has, in our judgment, indiscriminately prescribed "Cure A" for "Disease B" — truth serum for an informant whose integrity is in good health but who desperately needs bifocal lenses.

### Impediments to Clean Analysis:

### Mistaken Identity Based on Surface Resemblance

As the two cases — *Aguilar* and *Spinelli* — interact upon one another, the confusion stems from both ends. At the prescribing end, the root of difficulty is that the functionally distinct remedies of *Spinelli* involve, largely by coincidence, two surface similarities: both speak of "detail" (although one

---

13. See Moore v. State, 13 Md. App. 711, n. 1.

speaks of independent police observations verifying a number of "details," while the other speaks of the story told by the informant himself being "in great detail," to wit, "self-verifying detail"); additionally, both refer to *Draper* as an illustrative "benchmark" (they refer, of course, to different aspects of *Draper:* one, to the observations made by the FBI and the other, to the story told by the informant in the first instance). Because of the surface resemblances, a less than careful reading of *Spinelli* results in a hopeless intermingling of these remedies and makes confusion inevitable.

### Impediments to Clean Analysis:

### The Unreliability of "Reliability"

The source of confusion at the diagnostic end, on the other hand, is not inherent in the *Aguilar* opinion itself but results from the careless linguistic habits of the opinions which refer to *Aguilar* — from what Justice Frankfurter referred to as "the use of language not with fastidious precision." [14] The fault lies in the indiscriminate overuse of the adjective "reliable" and its variant forms.

*Aguilar* was concerned with the ultimate trustworthiness of hearsay information. All hearsay was not to be rejected out of hand; neither was all hearsay to be uncritically accepted; some guidelines had to be devised to separate the wheat from the chaff. *Aguilar* sought first to ascertain the actual source of the incriminating information. The "basis of knowledge" prong was designed to locate that source and to examine the validity of his conclusion. It was not concerned with the integrity of the informant (that test would come later via the other prong) but only with his ratiocinative process — not with the honesty of his narration but with the nature of his perception: (How did he reach *his* conclusion? Did he see something or hear something firsthand or did he merely pass on a story or rumor from someone else? Or did he simply jump to a wrong conclusion on the basis of

---

**14.** *United States v. Rabinowitz,* 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed. 653 (1950), at 339 U. S. 72.

inadequate or ambiguous observations?) The simple thrust of the "basis of knowledge" prong was that the informant must not pass on his conclusion, let alone the conclusion of someone else, but must furnish the raw data of his senses, so that the reviewing judge could draw his own conclusion from that data.

Once having located the original source — the person who saw, heard or smelled something firsthand — then and only then did *Aguilar* look to the "veracity" of that source. As a substitute for the classic trustworthiness device of the oath, it sought some alternative guarantee that the declarant spoke truthfully. It sought "some of the underlying circumstances from which the officer concluded that his informant was 'credible,' or his information 'reliable'." The "veracity" prong, in precise terms, has two disjunctive spurs, seeking *either* a) the inherent "credibility" of the person himself *or* b) some other circumstances reasonably assuring the "reliability"[15] of the information on the particular occasion of its being furnished.

In outline form, *Aguilar* was concerned with:

The *Trustworthiness* of Hearsay
    I. The *Basis of Knowledge* Prong
    II. The *Veracity* Prong
        A. The *Credibility* Spur
        B. The *Reliability* Spur

That essentially simple outline, which could be an instrument of precise analysis, has been heedlessly blurred and blunted. The case law is strewn with the random employment of the word "reliability" to connote the overall subject of the outline itself and every one of its constituent parts.[16] There is frequently no consistency in usage within a

---

**15.** The word dealt only, in this limited context, with some circumstantial guarantee that the informant — as a hearsay declarant — was speaking truthfully, and not with the broader consideration of the ultimate acceptability of the hearsay. "Reliability" in its precise *Aguilarian* sense is but a constituent part of a larger constituent part of an ultimate totality. It cannot be, therefore, the totality itself, for which some other label must be devised.

**16.** See Note, *Probable Cause and the First-Time Informer*, 43 Colo. L. Rev. 357 (1972), at 360, n. 14.

single opinion, let alone between opinions and between courts. As a result, to use one opinion's "reliability" analysis as authority to solve another case's "reliability" problem is all too often to compare apples with oranges. We should never use a portmanteau word unless we are careful to designate which of its various connotations we have in mind on a particular occasion. When the case law speaks of "reliability," does it refer to: RELIABILITY SUB 1 ("Is the hearsay information as a whole ultimately 'reliable' and, therefore, acceptable?"); RELIABILITY SUB 2 ("Was the information gathered in a 'reliable' way?"); RELIABILITY SUB 3 ("Does the hearsay stem from a 'reliable' source?"); RELIABILITY SUB 4 ("Has past performance shown the informant to be a 'reliable' person?"); RELIABILITY SUB 5 ("Do the circumstances under which the information was furnished otherwise guarantee it to be 'reliable'?"). The outline has deteriorated into:

The *Reliability* $_1$ of the Hearsay

   I. The *Reliability* $_2$ Prong
   II. The *Reliability* $_3$ Prong
      A. The *Reliability* $_4$ Spur
      B. The *Reliability* $_5$ Spur

When a word degenerates into a universal adjective, it loses all utility as a tool for discriminating thought.[17] Although as a word of art, "reliability" should refer exclusively to Item II B in the outline, it is thoughtlessly used as a careless synonym for "trustworthiness," "basis of knowledge," "veracity," and "credibility" with the inevitable consequences. "Reliable" has become, in a word, unreliable.[18]

---

**17.** When every *Aguilarian* symptom is described in the same terms, it is little wonder that diagnosis wavers and that inappropriate remedies are prescribed. See, for instance, *Manley v. Commonwealth*, 211 Va. 146, 176 S.E.2d 309. The Court, at 211 Va. 150-151, poses the crucial question in terms of RELIABILITY SUB 5 and then answers the question in terms of RELIABILITY SUB 2. The concurring opinion of Judge Gordon argued correctly that a sound "basis of knowledge" had no bearing on the distinct question of "veracity."

**18.** The old aphorism, "The Greeks had a word for it," was a profound comment upon not only the precision of Greek language but, as a direct consequence, the precision of Greek thought as well. When language becomes imprecise, thought becomes imprecise.

### Misreading a Disjunctive Minor Theme for a Conjunctive Major Theme

A second and only partially related pitfall for those who read *Aguilar* haphazardly is an intermingling of two dualities — 1) the major and conjunctive duality requiring that *both* the "basis of knowledge" prong *and* the "veracity" prong be satisfied, and 2) the minor and disjunctive duality describing how the "veracity" prong may be satisfied by showing *either* the informant to be "credible" *or* his information to be otherwise "reliable." The cases do not always keep these dualities distinct. Incredibly, they sometimes lift the "either-or" language describing an internal operation within the "veracity" prong and misapply it to the external relationship between the two prongs. Having once made that inadvertent transfer, they then conclude erroneously that the two requirements of the "two-pronged test" are in the disjunctive rather than the conjunctive and that it suffices, under *Aguilar*, to show *either* "veracity" *or* "basis of knowledge." [19]

The mistake is facilitated by the treacherously inadvertent reference to the "basis of knowledge" prong as that prong which seeks to ascertain "whether the information was gathered in a reliable [2] way" — sometimes informally abbreviated as *informational reliability*. It is all too easy to misidentify that "basis of knowledge" prong, when it is thus traveling under its informal label, with the second spur of the "veracity" prong, which seeks to know whether the informant's "information is reliable [5] " — also sometimes informally abbreviated as *informational reliability*. When both dualities end up containing a linguistically identical (though functionally distinct) term, the mistaken identity of one for the other is almost guaranteed. If we can't keep our terms straight, we can't keep our thoughts straight.

The quintessential difficulty lies, in the last analysis, not

---

**19.** A classic instance of such a misapplication is *United States v. Crawford*, 462 F. 2d 597 (9th Cir. 1972).

with *Aguilar* and *Spinelli* as opinions,[20] but with the elusive nature of the hearsay problem itself — How does a judge fulfill his constitutional obligation to test a non-appearing and non-swearing declarant? As long as we are properly committed to accept some, but not all, hearsay to establish probable cause, *Aguilar* and *Spinelli* are well-honed instruments for sorting the trustworthy from the untrustworthy. The built-in subtleties are such, however, that a slipshod application calls down upon us the fury of Murphy's Law.[21]

## The Present Case:
### The Primary Function of Independent Observations

With a "weather eye" then to the linguistic and analytical snares, we look to the State's suggested cure in terms of the hearsay's perhaps fatal infirmity.

The State urges, inter alia, the utility of independent police observations. We reject the notion that the independent observations can serve them in any fashion in the case at bar. Such observations serve two purposes. They have a primary function, of course, bearing directly on the establishment of probable cause. When such observations are sufficient in themselves to demonstrate probable cause, the final problem is thereby solved and all information both from and about the informant becomes a redundancy; probable cause is established without necessary resort to the hearsay. Similarly, direct observations, insufficient unto themselves to establish probable cause, may nevertheless be added to trustworthy hearsay, which meets *Aguilar*'s standards but is also insufficient unto itself, so that the combination of incriminatory elements may establish the probable cause which neither alone quite demonstrates. In that primary capacity, independent observation is an element contributing directly to the ultimate totality. This is the basic function of data observed by the affiant himself. In that primary role, police observation parallels qualified

---

**20.** Those who project the difficulty from the problem itself into the cases describing it, may well suffer "the Cleopatra syndrome." Cleopatra, when informed of Marc Anthony's infidelity, angrily sentenced to death the messenger who had brought her the bad tidings.

**21.** "What can go wrong, will go wrong."

hearsay and represents an independent factor tending in the same ultimate direction. It is added to the hearsay but does not influence the qualifying of the hearsay.

It is not that primary function which concerns us here, however. The direct observations at bar, standing alone, were innocuous and did not remotely approach a showing of probable cause. Nor may their contribution to that showing in a direct but supplementary fashion have any significance, unless and until the hearsay itself qualifies as an element eligible for supplementation. We are concerned here rather with the subsidiary and ancillary function of direct police observations — the qualifying influence they may have on otherwise questionable hearsay.

### The Ancillary Function of Independent Observations

That direct observations may have a qualifying influence upon questionable hearsay is both the teaching of *Spinelli* and the ineluctable dictate of plain logic. That influence bears, furthermore, directly on the issue of "veracity." When the internal recitation of "some of the underlying circumstances which led the officer to conclude that his informant was 'credible' or his information 'reliable' " has not been sufficient to satisfy *Aguilar*'s "veracity" prong directly, then this buttressing technique enunciated by *Spinelli* comes into play to determine whether it can "fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar*'s tests without independent corroboration." *Spinelli*, at 393 U. S. 415.

The relevance of this particular remedy to this particular defect is clear. When independent police observations have verified part of the story told by an informant, that corroboration lends credence to the remaining unverified portion of the story by demonstrating that the informant has, to the extent tested, spoken truly. *Hignut v. State*, 17 Md. App. 399, 411, 303 A. 2d 173. The verification helps to demonstrate his "credibility." Present good performance shows him to be probably "credible" just as surely as does past good performance.

In the instant case, however, the informant's "veracity" needed no additional buttressing. It had already passed muster by the initial *Aguilarian* analysis. The verification was, therefore, superfluous. Contrary to the suggestion of the State, the dual requirements represented by the "two-pronged test" are "analytically severable" [22] and an "overkill" on one prong will not carry over to make up for a deficit on the other prong.

In the case at bar, it was *Aguilar*'s "basis of knowledge" prong which the testimony of Detective Oatman failed to satisfy. The inappropriateness of the "independent verification" curative technique to that defect is self-evident from the very nature of the test itself.

### The Nature of the "Basis of Knowledge" Test

The "basis of knowledge" test is not concerned one whit with an informant's honesty or "veracity." It is concerned, rather, with conclusionary validity. Even assuming "credibility" amounting to sainthood, the judge still may not accept the bare conclusion of that "credible" informant anymore than he may accept the bare conclusion of a sworn and known and trusted police-affiant.[23] *Nathanson v. United States*, 290 U. S. 41, 54 S. Ct. 11, 78 L. Ed. 159 (1933); *Giordenello v. United States*, 357 U. S. 480, 78 S. Ct. 1245, 2 L.Ed.2d 1503 (1958). To do so would be an unconstitutional delegation of the decision-making function which the Fourth Amendment lodges exclusively in the judge himself.

---

**22.** *United States v. Harris, supra,* at 403 U. S. 592 (dissenting opinion by Harlan, J.).

**23.** The concurring opinion of Justice White in *Spinelli* put the question succinctly, at 393 U. S. 424:

"[D]id the information come from observation, or did the informant in turn receive it from another? Absent additional facts for believing the informant's report, his assertion stands no better than the oath of the officer to the same effect. Indeed, if the affidavit of an officer, known by the magistrate to be honest and experienced, stating that gambling equipment is located in a certain building is unacceptable, it would be quixotic if a similar statement from an honest informant were found to furnish probable cause."

The "basis of knowledge" prong assumes an informant's "veracity," and then proceeds to probe and test his conclusion: ("What are the raw facts upon which the informant based *his* conclusion?" "How did the informant obtain those facts?" "What precisely did he see or hear or smell or touch firsthand?" "If he heard the facts from someone else, what makes that third person 'credible' and how did that third person come by the knowledge?"). The judge must ascertain the source for the raw data — the product of someone's senses — and then weigh that data for himself. He is concerned not with that part of an affidavit or testimony which provides information *about* the informant but with the recitation of the story coming *from* the informant.

## The Non-Transferability of Spinelli's Remedies

Apparently not being willing to rely exclusively upon the curative technique of "self-verifying detail," the State tenders, as an alternative or additional remedy, the curative technique of "independent verification." The tender is unacceptable. Each remedy is appropriate only to the particular infirmity for which it was uniquely devised. They are simply not transferable.

On the one hand, the "independent verification" technique cannot repair a defect in the "basis of knowledge" prong. Verifying the truth of part of a story does nothing either to ascertain the story's source or to check the informant's perhaps invalid conclusions. To the extent to which police observations, in their primary function, duplicate parts of an informant's tale, they do, to be sure, make those parts redundant. To the extent to which the unverified portion remains an indispensable element, however, it has to present data from an ascertainable source. We simply do not verify the "credibility" of the vague unknown.

An informant who does not speak from personal knowledge may well be passing on an amalgam of underworld rumor and barroom gossip. If that be true, the verification of one contributing rumor would do nothing for the "veracity" of other contributing rumors. An informant

may have made, moreover, innocent observations and then received incriminating information from a third party lending inculpatory color to those observations. Merely verifying the informant's innocuous observations does nothing to verify the crucial third party who supplied the damning catalyst.

An informant may, furthermore, be leaping to an erroneous conclusion on the basis of innocent or ambiguous observations. Independent verification of an ambiguous factual premise cannot allow an informant to draw an invalid conclusion therefrom. The full premises must be set forth from which the judge may construct his own ultimate syllogism. Even a "credible" informant may engage in bizarre flights of logic, which is precisely why the judge must know just what the informant saw and heard and must not buy an informant's bare conclusion.

Partial verification of an unattributed tale does not, by its very nature, pinpoint the source or sources of the tale, nor does it certify the validity of the possible conclusions interwoven therein. "Basis of knowledge" still requires, explicitly or implicitly, an ascertainable source for each item of raw, primary data. Partial verification does not serve to provide that.[24] The remedy has no bearing on the problem. The Comment, *The Informer's Tip as Probable Cause for Search or Arrest*, 54 Cornell L. Rev. 958 (1969), is instructive, at 963, n. 30:

> "[C]orroboration should not be considered in applying this [the "basis of knowledge"] test. Independent corroboration of some of the facts alleged by the informer may indicate truthfulness; i.e., that the tip is not completely fabricated, but does not suggest that the informer's knowledge was

---

**24.** That "independent verification," as a technique, has a utility limited to the "veracity" prong is made clear in Note, *Probable Cause and the First-Time Informer*, 43 Colo. L. Rev. 357 (1972), at 361:

"The corroborating information is thus relevant to the second determination required by *Aguilar*, the determination of the report's trustworthiness."

obtained through personal observation or other dependable manner."

Conversely, the "self-verifying detail" technique cannot repair a defect in the "veracity" prong. The notion that great detail implies personal observation rather than the overhearing of barroom gossip, presupposes an honest informant. If the informant were concocting a story out of the whole cloth, he could fabricate in fine detail as easily as with rough brush strokes. Minute detail tells us nothing about "veracity." As was observed in Note, *Probable Cause and the First-Time Informer*, 43 Colo. L. Rev. 357 (1972), at 362:

> "Uncorroborated detail of any amount hardly supports an inference that the informer is trustworthy, for even a wealth of detail is easily fabricated. For this reason, detail of this sort goes only to the first test of *Aguilar*, the basis test."

### *The Cure for Defective "Basis of Knowledge": "Self-Verifying Detail"*

Having established that the remedies of *Spinelli* are non-transferable and having rejected the independent police verification proffered by the State to repair the defect in *Aguilar*'s "basis of knowledge" prong because the very technique has no relevance whatsoever to that defect, we do not necessarily hold that probable cause has not been established. Having rejected the false remedy, we proceed to analyze the effect on the infirmity at bar of the proper remedy — the "self-verifying detail" technique described in *Spinelli*.

When that recitation coming *from* the informant is defective — when it fails to assert that the informant is recounting firsthand observations — then the curative technique suggested by *Spinelli* is that of "self-verifying detail." In taking *Draper* as an illustrative benchmark for this technique, *Spinelli* pointedly referred only to that aspect of *Draper* "detailing" the story coming *from* the informant. The independent verifications made by the police in *Draper*

were not considered in this context and were, indeed, irrelevant to the point to be proved. *Spinelli* described the logical inference at work, at 393 U. S. 416-417:

> "In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.
>
> The detail provided by the informant in *Draper v. United States* ... provides a suitable benchmark. While Hereford, the Government's informer in that case, did not state the way in which he had obtained his information, he reported that Draper had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. Moreover, Hereford went to describe, with minute particularity, the clothes that Draper would be wearing upon his arrival at the Denver station. A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way."

Justice White, in his concurring opinion in *Spinelli*, added the fifth and necessary vote to make "self-verifying detail" the "law of the land," reiterating as he did so the point that it is only the "detail" contained within the informant's story which gives rise to the inference, at 393 U. S. 425:

> "I am inclined to agree with the majority that there are limited special circumstances in which an 'honest' informant's report, if sufficiently detailed, will in effect verify itself — that is, the magistrate when confronted with such detail could reasonably infer that the informant had gained his information in a reliable way. ... Detailed information may

"sometimes imply that the informant himself has observed the facts."

Within that analytical framework, we note that the quantity of information furnished by the informant is borderline. The question is a close one. It would have been preferable for Detective Oatman to have demanded more detail from his informant and, in turn, to have passed on more detail to the trial court. Using *Draper* and our own decision in *Owings v. State*, 8 Md. App. 572, 261 A. 2d 223, as "benchmarks," however, we conclude that the detail coming *from* the informant in this case was enough, though just barely so, to provide a reasonable assurance that he was speaking from firsthand observation.

Under the "self-verifying detail" technique of *Spinelli*, using the appropriate portion of *Draper* as its guideline, the initially inadequate satisfaction of *Aguilar's* "basis of knowledge" prong in the case at bar is repaired.

### *Disclosure of the Informant's Identity*

The appellant also contends that the trial judge committed error in permitting the State to withhold the identity of the informant. The law is clear that where an informant simply furnishes probable cause and is not a participant in the criminal transaction, the State is not required to divulge his identity. The critical question, in determining when disclosure is required, is whether the informant was "an integral part of the illegal transaction" and, therefore, "necessary and relevant to a fair defense." *McCray v. Illinois, supra; Nutter v. State*, 8 Md. App. 635, 262 A. 2d 80; *Whittington v. State*, 8 Md. App. 676, 262 A. 2d 75; *Gill v. State*, 11 Md. App. 593, 275 A. 2d 505. The appellant proceeds on the thesis, however, that the informant may have been Walter Holak and that that fact brings the case within the rule of *Roviaro v. United States*, 353 U. S. 53, 77 S. Ct. 623, 1 L.Ed.2d 639 (1957). The rule of *Roviaro* is simply that a defendant is entitled to the name of a participant in the crime, because that participant is a material witness to the critical transaction. In the case at bar, the material witness was Walter Holak and the appellant was fully aware of his

identity. Whether he was or was not an informant in addition to being a material witness is beside the point. To the extent to which his testimony was necessary to the defense, his identity was fully known.

### Permitting a Witness to Invoke the Fifth Amendment

The appellant called Walter Holak as a defense witness. The judge asked the jury to retire before putting Mr. Holak on the stand. Judge MacDaniel then pointed out for the record that Holak's attorney had visited the judge in chambers that morning and had informed him that, after full discussion between the attorney and Holak, it was their mutual decision that Holak would refuse to give testimony on the ground that it might tend to incriminate him. After that recital, Judge MacDaniel asked Holak if it was still his intention to invoke the Fifth Amendment privilege against compulsory self-incrimination. Holak answered that it was. Counsel for the appellant pointed out that all questions would be restricted to the events of July 3, 1972, the day on which Holak and the appellant were arrested. Holak reiterated his firm resolve to invoke the privilege as to all questions concerning the activities of that day. Judge MacDaniel ruled that Holak was not a compellable witness and excused him. He thereafter informed the jury that Holak had been called by the defense but had invoked the privilege against self-incrimination and would not, therefore, testify in the case.

We see nothing improper in the actions of the court and nothing that offends the guidelines set out in *Midgett v. State*, 223 Md. 282, 164 A. 2d 526, and *Royal v. State*, 236 Md. 443, 204 A. 2d 500.

*Judgment affirmed; costs to be paid by appellant.*