[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 524 
Elbert Patton Channell, III was indicted and convicted for trafficking in cannabis in violation of Ala. Code 1975 §20-2-80. Sentence was three years' imprisonment and a fine of $25,000. Four issues are raised on appeal.
 I
Channell argues that he was improperly stopped because the police did not have probable cause and that the subsequent search of his automobile was improper because of the lack of exigent circumstances.
Tuscaloosa Police Officer John Samaniego, assigned to the West Alabama Narcotics Unit, received a telephone call from an informant on May 29, 1983, shortly before 8:00 a.m. Officer Samaniego testified:
 "I received information from a confidential reliable informant that a white 1969 Chevrolet displaying Texas tags of 536 BFC would be en route from Birmingham on I-59 and when it would get to Tuscaloosa it would go to the Alpine Hills area of the city; would be driven by a white male and would have a black male passenger. This vehicle would be transporting a large quantity of marijuana."
The informant stated that the car would arrive in Tuscaloosa between 8:00 and 9:00 that morning.
Officer Samaniego knew that the informant resided in Tuscaloosa and testified that he had been reliable in the past by providing information that had led to an arrest and conviction. Defense counsel was not allowed to prove that "in an earlier hearing . . . Officer Samaniego indicated that there were some arrests involved but never any convictions as a result of this particular informant."
Acting on the informant's telephone call, officers of the West Alabama Narcotics Unit established surveillance. They spotted the car described by the informant traveling on I-59 and followed it into Tuscaloosa where they stopped it at the entrance to Alpine Hills sometime after 8:00 a.m. and before 8:45 a.m.
Channell was driving the car. Porter Lee Blakeney, a black male, was the passenger. Both men were ordered out of the car. Officer William B. Wilkins testified "just instantaneous" with Blakeney getting out of the car he observed "a small manila envelope" on the front seat and a torn "paper bag in the front floorboard that had a set of [postal] scales in it."
An officer removed the keys from the vehicle and opened the trunk. A package and a pasteboard box containing plastic bags of marijuana were discovered. A little over ten pounds of marijuana was found in the car.
Channell contends that there was no probable cause to search his car because the police did not know the factual basis of the informant's knowledge — that is, the police did not know how the informant obtained his information.
In Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317,76 L.Ed.2d 527 (1983), the two-pronged *Page 525 
test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509,12 L.Ed.2d 723 (1964), and Spinelli v. United States,393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), for determining whether an informant's tip established probable cause was emphatically rejected as hypertechnical and unrealistic.Massachusetts v. Upton, 466 U.S. 727, 104 S.Ct. 2085,80 L.Ed.2d 721 (1984). Gates holds that an informant's "`veracity,' `reliability' and `basis of knowledge' . . . should be understood simply as closely intertwined issues that may usefully illuminate the common sense, practical question whether there is `probable case'. . . ." 103 S.Ct. at 2327-28. "[T]hey are better understood as relevant considerations in the totality of circumstances analysis . . .: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." 103 S.Ct. at 2329. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 103 S.Ct. at 2332. "Although an informant's `veracity' and `basis of knowledge' are no longer to be `understood as entirely separate and independent requirements to be rigidly exacted in every case,' they are still `highly relevant' in determining whether probable cause existed. Gates, 103 S.Ct. at 2327." United States v. Phillips,727 F.2d 392, 395 (5th Cir. 1984).
In our judgment, the informant's tip here provided probable cause for the vehicle stop, even under the stringentAguilar-Spinelli standard, and it was certainly justified under the more flexible "totality of the circumstances" analysis ofGates.
Using the Aguilar-Spinelli test, there is no question about the first prong, or the informant's veracity. Regardless whether the tipster's past information had led to arrests and convictions, or only arrests, his reliability was established by Officer Samaniego's testimony. See Hatton v. State,359 So.2d 822, 827 (Ala.Cr.App. 1977), cert. quashed, 359 So.2d 832
(Ala. 1978), and authorities cited therein.
By the same token, under the Aguilar-Spinelli test, it is equally clear that the tip failed the second prong, or basis-of-knowledge test. That is, the tip contained none of the underlying circumstances demonstrating how the informant gained his knowledge. This deficiency can, however, be cured if the tip "describe[s] the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Spinelli v. United States,393 U.S. at 416, 89 S.Ct. at 589. In other words, if there is enough "self-verifying detail" in the tip it will permit the inference that the informant spoke from firsthand knowledge. Stanley v.State, 19 Md. App. 507, 313 A.2d 847 (1974). Based on the analysis of Stanley, supra, a much-cited opinion whose facts are almost directly in point with the present case, we believe the tip here was sufficiently detailed so that it cured the defect in the basis-of-knowledge prong.
In Stanley the tipster, whose veracity was not at issue — as it is not in issue here — gave the following information:
 "[H]e stated at this time, one David Stanley would be operating a 1964 yellow Chevrolet and he would have in his possession Cocaine and Heroin. The informant stated the Stanley subject would be in the Dundalk area near the pool hall between the hours of eight o'clock and 8:30. At this time he would also be accompanied by another white male subject by the name of Walter Holak."
313 A.2d at 851. Following receipt of the tip, the police officers went to the Dundalk area, set up surveillance across the street from the pool hall, and saw the accused, along with the passenger Holak, drive up in a yellow Chevrolet at 8:20. The Stanley *Page 526 
court concluded that the detail in the tip itself "provide[d] a reasonable assurance that [the informant] was speaking from firsthand observation." 313 A.2d at 863. It held that "the initially inadequate satisfaction of Aguilar's `basis of knowledge' prong . . . is repaired." Id. The court also went to great lengths to explain that police corroboration of the details of the tip did nothing to bolster the defective basis-of-knowledge prong; corroboration, the court explained, cures only a weakness in the informant's veracity.
We have virtually identical facts in the case before us. The reliable informant here provided Tuscaloosa authorities with the color and year model of the subject automobile, as the tipster had done in Stanley. In addition, the tipster in the present case also added the vehicle's license tag number. Both tips included the auto's destination, time of arrival, and the description of its driver and passenger. Finally, although theStanley court found it unnecessary to the holding, both tips were corroborated by independent police observation. In short, we find no material distinction between the facts of Stanley
and those of the case at bar and, therefore, hold that even under the rigid Aguilar-Spinelli test, the Tuscaloosa authorities had probable cause to stop Channell's vehicle. Under the more flexible Gates test for probable cause, the result is the same.
Like the appellant in our recent case of David NicholasFrederick Cooper v. State, 480 So.2d 8 (Ala.Cr.App. 1985), Channell argues that because his vehicle was no longer mobile after he and Blakeney were handcuffed and the car keys in possession of the police, there were no "exigent circumstances" to justify a warrantless search. Writing for the Court inCooper v. State, supra, Judge Taylor answered this contention as follows:
 "`[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband.' United States v. Ross, 456 U.S. 798, 823 [102 S.Ct. 2157, 2172, 72 L.Ed.2d 572] (1982). . . . The law is `clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized.' Michigan v. Thomas, 458 U.S. 259, 261
[102 S.Ct. 3079, 3080-3081, 73 L.Ed.2d 750] (1982). See also Florida v. Meyers, 466 U.S. [380], 104 S.Ct. 1852
[80 L.Ed.2d 381] (1984), United States v. Ross, supra, Texas v. White, 423 U.S. at 67 [96 S.Ct. 304, 46 L.Ed.2d 209] (1975), and Chambers v. Maroney, 399 U.S. 42 [90 S.Ct. 1975, 26 L.Ed.2d 419] (1970). In fact, `[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure.' United States v. Johns, [___ U.S. ___, 105 S.Ct. 881, 83 L.Ed.2d 890] supra. Therefore the officers' latter two searches that occurred approximately one hour and two hours later, respectively, were constitutionally permissible.
 "The appellant also argues that there were no exigent circumstances, and, therefore, that the searches were not valid. The presence of exigent circumstances coupled with probable cause to search is a separate and distinct exception to the warrant requirement. The appellant's intermingling of the two exceptions is understandable, because the distinction between the two exceptions has become unclear over the years. However, the Supreme Court has recently restated the separateness of the two exceptions: `A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search.' United States v. Johns, supra. See also Michigan v. Thomas, supra, at 261-262, [102 S.Ct. at 3080-3081] reversing `the Court of Appeals [which] held that the absence of "exigent circumstances" precluded a warrantless search.'"
 IIA
Channell claims that the Court erred by allowing the State to question him *Page 527 
as follows regarding a prior misdemeanor conviction for possession of marijuana:
 "Q [By Assistant District Attorney] Would you mind looking at the contents of that box, please, sir — those Ziploc Baggies?
"(Witness complies with the request.)
 "Q This is one here that has an "N" written on it. Would you examine that, please?
"(Witness complies with the request.)
"Q Do you know what that is?
"A I'm not positive.
 "Q Have you ever seen anything similar to that before?
"A Yes, sir.
"Q Before March 29th?
"A I have seen a lot of similar things.
"Q Let me be more specific. Had you seen marijuana?
"A No, sir.
 "Q Before March 29th you have never seen any marijuana before?
"A No.
"MR. JOHNSON: Judge, let me approach the bench.
 "(Thereupon there was a bench conference between counsel and the Court out of the hearing of the jury and on the record as follows:)
 "MR. JOHNSON: His testimony was that he didn't know — The container was sealed and he hasn't seen inside of the container. Now he wanted to know have you ever seen marijuana before. And the only possible thing that could do was raise the point that on occasions he had possession of or had dealings, and I say that's objectionable. I mean, there is absolutely nothing that can come of this other than for him to be asked about some relationship with criminal activity. And the exact point that Mr. Tipton is going to make either is that you have seen it on other occasions because you were convicted of possessing it in Texas or you've seen it on other occasions because you are a drug pusher. And there is nothing, absolutely nothing, that could be — could come of this but that.
 "MR. TIPTON: I think, Your Honor — I remind the Court of the case of Temple against State that I cited earlier this morning. The issue in this case has been focused on knowledge. That case says that —
"THE COURT: I'm going to overrule.
"MR. JOHNSON: We except.
 "(Thereupon the proceedings resumed within the presence of the jury as follows:)
"Continued Cross-Examination by Mr. Tipton:
 "Q Are you the same Elbert Patton Channell who was arrested on June the 7th of 1982 in Littlefield, Texas, and charged with possession of marijuana and subsequently convicted of possession of marijuana?
"A Yes, sir.
 "MR. JOHNSON: I object — just a second, Pat — on the ground that — We had a long discussion about that. That now places — I ask for a mistrial.
"THE COURT: Overruled. I overrule the objection.
"Q You are the same person?
"A Yes, sir.
"Q Then you have seen marijuana before?
"A Well, someone gave me a marijuana cigarette.
"Q Did you —
 "A So I had seen it in that form. I saw it, it was in a rolled cigarette." (R. 244-47)
Although the conviction was not generally admissible to impeach Channell's credibility because it was not a crime of moral turpitude, Luker v. State, 361 So.2d 1124 (Ala.Cr.App.), cert. dismissed, 361 So.2d 1127 (Ala. 1978), in this case Channell "opened the door" for the admission of his prior conviction by denying that he had ever seen marijuana before.Compare Thomas v. State, 445 So.2d 992 (Ala.Cr.App. 1984) (Although a youthful offender adjudication may not be used to impeach credibility, when the witness opens the door by denying his criminal intent in a case, his prior youthful offender plea of *Page 528 
guilty to the same offense is admissible). See generallyPeterson v. State, 452 So.2d 1372, 1375 (Ala.Cr.App. 1984), and cases cited therein. ("Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court.")
 IIB
Channell also contends that the State's cross-examination of him implied to the jury his commission of other more recent crimes not charged in the indictment. From the record:
 "Q Okay. Isn't it a fact that you were in Tuscaloosa on the night of March 28, the night before you were stopped, with Porter Lee Blakeney?
"A No, sir.
 "Q Isn't it a fact that you and Porter Lee Blakeney delivered marijuana in the amount of approximately 10 pounds on the night of March 28?
 "MR. JOHNSON: I object to that. That's the first time I have heard of that. I object to that.
 "Now, Judge, all he wants to do is ask the questions. The answers don't even matter.
"THE COURT: It's cross-examination. I overrule.
"Q Isn't that a fact —
 "MR. JOHNSON: At some point in time — I don't have to do it right now. But I would like to have an opportunity to put all the grounds for the objection on the record.
"THE COURT: All right.
 "Q Isn't it a fact that on the night of March 28 that you also received orders on an additional 10 pounds?
"A No, sir.
"Q You were with Porter Lee Blakeney at that time?
"A No, sir.
 "Q Isn't it a fact that you received orders for 8 pounds of marijuana on the night of March 28 and didn't have enough to fill that order and returned on the morning of March 29 with enough to fill the order?
"A No, sir.
 "Q Isn't it a fact that you and Porter Lee Blakeney packaged this marijuana that was in this box; broke it up into a 8-pound allotment in the box and 2 pounds in a separate bag for delivery to Tuscaloosa that morning before you left?
"A No, sir.
"MR. TIPTON: That's all.
"MR. JOHNSON: That's all." (R. 247-48)
Channell does not dispute the State's factual basis for asking the questions. Instead, he claims that although the State may have had the necessary factual predicate for the questions, the answers would have been inadmissible. In our judgment, this issue was resolved in Speaks v. State, [Ms. 5 Div. 954, April 9, 1985] (Ala.Cr.App. 1985), where we observed the following:
 "Even had this issue been properly preserved for review, the admission of the evidence of the other sales of marijuana was proper. The sales were all conducted at the same place and near the same time. They were part of one continuing transaction and properly admitted even though each sale constituted a separate criminal offense. C. Gamble, McElroy's Alabama Evidence, § 69.01 (3) (3rd ed. 1977). The other offense was also admissible to show that the defendant was acting pursuant to a single plan, design, scheme, or system. McElroy's, § 69.-01 (6). We find no error in their admission."
Ms. Op. at 12.
 IIC
Next, Channell insists that the prosecutor's reference, in closing argument, to the fact that marijuana could "filter down" to young people because of dealers like Channell, was error. A review of the record, however, discloses that defense counsel's objection to the remark was sustained by the trial court and there were no curative instructions requested. *Page 529 
Accordingly, there is no adverse ruling for us to review. SeeDiamond v. State, 363 So.2d 109 (Ala.Cr.App. 1978).
 III
Channell maintains that the State failed to prove his knowledge of the presence of contraband. He claims that because both the manila envelope containing marijuana and the scales were found on the co-defendant passenger's side of the automobile, there was nothing to link him with the drugs in the trunk, which were packaged so as to conceal their contents.
He testified at trial that after he agreed to give passenger Blakeney a ride to Tuscaloosa for $15 plus gasoline money, Blakeney asked him for the car keys in order to put something in the trunk. Channell stated that he had no idea what Blakeney put in the trunk. In contrast to Channell's version of the incident, however, Officer Terry Pennington of the West Alabama Narcotics Squad testified that after Channell's vehicle was stopped and impounded he asked Channell "how much grass was there," and Channell replied "that there was about 10 pounds of it. And then he said, `I was just bringing it to Tuscaloosa for Blakeney as a favor.'" (R. 54, 118). On the other hand, when Blakeney was questioned about the amount of marijuana, he told the Tuscaloosa authorities there were four or five pounds in the trunk.
Although the defendant's mere presence in an automobile containing contraband is not sufficient in and of itself to support a conviction for possession of a controlled substance,Story v. State, 435 So.2d 1365, 1366 (Ala. 1983), here the State introduced the additional evidence that Channell was the owner and driver of the vehicle and admitted to police that he was transporting ten pounds of marijuana to Tuscaloosa. Thus, there can be no serious doubt that the State proved a prima facie case of knowledge of the presence of the contraband. The fact that passenger Blakeney may also have been involved in the transaction does not exonerate Channell. Possession of illegal drugs is susceptible of joint commission. Allen v. State,382 So.2d 1147, 1156 (Ala.Cr.App.), cert. denied, 382 So.2d 1158
(Ala. 1980).
 IV
Channell insists that the court erred by not granting his motions for mistrial after the jury informed the court, on two occasions, that it was unable to reach a verdict.
The jury first retired to deliberate on Wednesday, September 28 at 3:31 p.m. Two hours later the following occurred:
 "(At 5:30 p.m. the jury buzzed and the following occurred:)
"THE COURT: Do you have a spokesman?
 "THE FOREMAN: We just can't get together. There's eleven for it and one against it.
 "THE COURT: Well, I'm going to let you folks go on home for the day unless you want to stay longer. But I'm going to require you to come back in the morning and continue your deliberations. Do you want to stay a while now?
"THE FOREMAN: No.
 "THE COURT: All right. Don't try to continue any deliberations on your own. Wait until you get back here tomorrow and continue the deliberations. When you get here in the morning, take your place back here in the box. When all twelve of you are here you can resume. More than at any time now, it's important that you don't allow anyone to discuss this with you and don't discuss it with anyone else. I'll see you in the morning at 9:00.
 "(Thereupon the jury was dismissed for the night.)" (R. 287-288)
The next morning the jury resumed its deliberations at 9:00 a.m. and remained in the jury room until noon, when the following transpired.
 "THE COURT: Is there any among you who cannot be back here at 1? Would an hour be sufficient for lunch? Anyone who can't be back? I will see you back at 1:00 o'clock. Don't continue any deliberations *Page 530 
on your own. Take your place back in the box at 1.
 "(The jury was dismissed for lunch and [the] following occurred:)
 "MR. JOHNSON: I understand that the jury sent you a message and said they were deadlocked? I don't know what the message —
 "THE COURT: They sent a message that they could not reach an agreement.
 "MR. JOHNSON: Right. And they sent a similar message — although not exactly — not phrased the same yesterday after two and a half hours. And now they have been deliberating since 9:00 and it's now close to 12:00, couple minutes before 12:00. And I would say that that is an indication that they cannot get together and they cannot be unanimous on this verdict. In light of that I would ask for a mistrial for all the various grounds that I have cited previously.
 "THE COURT: I will take your motion under advisement momentarily. I'm going to give them further opportunity to deliberate before I rule on your motion.
"MR. JOHNSON: We except.
"THE COURT: All right.
"(Lunch recess.)
"1:00 p.m.
"(All counsel, parties, and jurors present.)
 "THE COURT: Do you ladies and gentlemen have any other questions of the Court?
 "I'm going to ask you then to resume your deliberations.
 "(The jury was returned to the jury room for further deliberations.)
 "MR. JOHNSON: Judge, do you have any idea how long you are going to keep them back there?
"THE COURT: No, sir.
 "MR. JOHNSON: I would like to state again that we move for a mistrial. I believe they are deadlocked and they have indicated it twice.
"THE COURT: Is that your motion?
 "MR. JOHNSON: By making them continue to go back there after indicating twice they are deadlocked —
 "THE COURT: It's common practice, Mr. Johnson. I'll overrule your motion.
 "MR. JOHNSON: Particularly in view of the fact that they indicated yesterday that it was deadlocked at eleven to one. That's what the foreman said in open court. And it just seems to me that by making them continue to go back puts increasing pressure on that one person to give up his true and heartfelt views to accommodate the majority. I think that is not common practice and it is not condoned by the appellate courts.
"THE COURT: Off the record, Peggy.
"(Thereupon there was a discussion off the record.)
 "(The jury, after further deliberation, returned to courtroom with their verdict at 1:56 p.m. and the following occurred:)
 "THE COURT: Ladies and gentlemen of the jury, have you reached a verdict in this case?
"THE FOREMAN: Yes, sir." (R. 293-95)
On appeal, Channell reiterates the argument made at trial that the court's sending the jury back for further deliberations after they twice indicated they were unable to arrive at a verdict was a form of coercion. Citing Morris v.State, 465 So.2d 1180 (Ala. 1985), and Gidley v. State,19 Ala. App. 113, 95 So. 330 (1923), Channell claims that if the jury was in fact split 11-1, as they stated, then the court's actions improperly suggested to the jury that the one holdout should conform to the will of the majority.
In our judgment, neither the facts of Morris nor the facts ofGidley parallel those of the present case. In Morris, although our Supreme Court deemed the trial judge's exhortations to the jury progressively more "strident" "with each encounter with the jury," at 1183, it found no error up to the point at which — after two announcements of a deadlock, eventually a verdict, and then a poll of the jurors in which one juror repudiated the verdict — the *Page 531 
trial judge directed the jury to resume deliberations and announced that he would be back by 5:00 that afternoon. TheMorris court determined that the judge's final comment "clearly put within the minds of the jurors a deadline for returning with an unanimous verdict." At 1183.
In Gidley, the Court of Appeals found that the trial judge's reference to the numerical division of the jury (11-1), even though accompanied by a disclaimer that the court did not wish the lone dissenter to compromise his convictions, was "an insidious suggestion" to the juror that may have caused him to yield to the majority. 19 Ala. App. at 115.
In the present case, the trial court did not indicate to the jury by his words or conduct that he "expected" a verdict, seeOrr v. State, 40 Ala. App. 45, 111 So.2d 627, affirmed, 269 Ala. 176, 111 So.2d 639 (1958), or that he hoped the "holdout" juror would agree with the majority, see Ashford v. McKee, 183 Ala. 620,62 So. 879 (1913). Most importantly, he neither inquired about, see Showers v. State, 407 So.2d 167 (Ala.Cr.App.), reversed, 407 So.2d 169 (Ala. 1981), nor referred to, seeGidley v. State, supra, the 11-1 numerical division when he sent the jury back for further deliberations:
 "It is quite clear that under Alabama law a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used."
Showers v. State, 407 So.2d at 171. We find not even the slightest hint of a suggestion in the court's instructions to the jury that the holdout juror yield to the majority will.
The judgment of the Circuit Court is due to be affirmed.
AFFIRMED.
All Judges concur. *Page 948