Randy Franklin was convicted of arson in the second degree, a violation of § 13A-7-42(a), Code of Alabama 1975, and sentenced to ten years' imprisonment. The building that was burned was set on fire twice, once on the night of December 19, 1983, and then again on the morning of December 22, 1983. The appellant requested the prosecution to choose which fire he was being charged with having set. The prosecutor responded by stating that he was proceeding against appellant with the second fire.
The evidence showed that on December 19, 1983, at 9:08 p.m., the Andalusia Fire Department received an alarm indicating that a house was on fire. Fireman Steele responded and found some of the rooms "engulfed in flames." He testified as follows:
 "We extinguished the flames and upon extinguishing the flames we went into our standard fire policy of salvage and overhaul, which is going through the house and looking for hot spots.
"Q To make sure the fire is out?
"A Yes, sir.
"Q Did you go from room to room?
"A Yes, sir.
"Q Tell us, where did you start?
 "A We started in the living room looking for hot spots and worked our way through to the dining room, kitchen and then we went to the left back bedroom and then we come back. Because of the origin of fire had been established — established that it was in the kitchen and this was the hottest part of the house.
 "Q All right, how did you establish that it was in the kitchen? *Page 823 
 "A Through a big hole that had burned in the floor, indicating that the fire had burned there the longest.
 "Q Okay, did you find anything there in the kitchen that would tend to tell how it started?
 "A We found some newspaper and it looked to be a heating element, which we believed to be the cause of the fire.
"Q Which type of heating element was it?
 "A It looked like a heating element out of a hair dryer.
"Q Did it have wires connected to it?
"A Yes, sir.
"Q Where did those wires go?
 "A They ran to a coffee pot that was plugged in on the counter, sink counter.
 "Q So you found a heating element to a hair dryer and it was then wired to —
"A To a coffee pot.
". . . .
 "A Yes, in the left back bedroom we found a half gallon jug, it looked like a milk jug. About half full of gasoline with the top off.
". . . .
 "Q All right, did you have some of the other officers, the other firemen to look in the attic and different area of the house?
 "A Yes, sir, Jeff Holland, firefighter Jeff Holland, looked in the attic plus under the house.
 "Q Did they chop a hole in the attic, in the roof I mean?
"A Not on the first fire."
Fireman Steele further testified that, at 11:51 a.m. on December 22, 1983, the following occurred:
 "A We were called back to this house, we had a report of smoke coming from the building. When we got there we found flames coming . . . they were in the ceiling, which we could see through the ceiling, because the ceiling had burned partly through, and we extinguished this fire.
"Q Could you see the damage to the ceiling?
"A Yes, sir.
"Q Is that when they cut the hole in the room?
"A Yes, sir. On the second fire.
 "Q And you could see the damage to the ceiling. How about the other areas, was there anything else on fire?
"A Not after we extinguished the fire — "
On cross-examination, Fireman Steele testified in part as follows:
 "Q And in your opinion this house was burned as a result of arson, was it not? "A Yes, sir.
". . . .
 "Q Do you know of anything in your investigation throughout the fire, that first fire, connecting Randy Franklin with that fire other than that being his residence?
"A No, sir.
 "Q Now you called Billy Treadaway [a police officer] over there that night, right?
"A Yes, sir.
 "Q And you told him in your opinion, over the telephone, we have got an arson situation here and I want you to come and investigate it?
"A Yes, sir.
". . . .
 "Q And you kept firemen there in shifts throughout the night, is that right?
"A Yes, sir.
"Q To secure the place?
"A Yes, sir.
 "Q And prior to the second fire this, to your knowledge, had this tape been taken down?
"A No sir, not that I know of.
 "Q Okay, the second fire, how long did it take you to extinguish it?
"A Two minutes maybe.
"Q I beg your pardon?
 "A Three minutes maybe. It wasn't, you know, it was a rag and some boards and it was stacked up against the chimney, plus it hadn't gotten started good. *Page 824 
 "Q Was there any flammable liquid on that rag that you recall?
"A Yes, sir.
"Q Are you sure?
"A It sure smelled like gasoline to me."
The appellant's grandmother testified on his behalf. She testified that on the morning of the second fire, appellant came by her home "about between eight or nine," and that she told him she wanted to go to the hospital to see her son. On the way to the hospital they drove by appellant's house at "9:30 or after 9:30." He went in the house for "four or five minutes" and came back to the automobile, and they then went to the "Little Kitchen," where they had something to eat and then went to the hospital. Her testimony continued in part as follows:
 "Q How long did you stay there at the hospital, Ms. Franklin, do you know?
 "A I really don't know. "Q Was it till after lunch?
 "A Well, they were fixing to bring lunch in there when we started to leave.
". . . .
"Q Where did you go then?
"A We went to our house.
"Q Who is our house?
"A To my house.
 "Q How long did Randy stay there at your house with you when you got home?
"A About between two and 3:00.
". . . .
 "Q And so from nine or eight in the morning until three, you were with Randy?
"A Yeah."
The defendant took the stand and denied that he was guilty of setting fire to the house. We quote the following from his testimony on direct examination:
 "Q I'll ask you, where were you early the morning of December the 22nd?
 "A Early morning I was at my mother's house, I spent the night there and went directly to my grandmother's about 8:00.
 "Q All right, how long did you stay at your grandmother's house?
"A About an hour.
 "Q All right, what did you do or did you do anything while you were there?
 "A Yeah, she read out of the Bible and showed me some Oral Roberts scriptures trying to get me to go to church.
"Q She had been trying to get you to go to church?
"A Yes, sir.
"Q What time did you leave her house?
"A 9:00.
"Q 9:00 that morning?
"A Yes, sir.
"Q Could it have been 9:30?
 "A It could have been 9:15 or something along in there. Between 9 and . . . well it takes time to drive over there.
"Q Where did you go when you left her home?
"A Where did I stop first?
"Q Where did you stop first?
"A I stopped first at that house that burned.
"Q All right, on Snowden?
"A Yes, sir.
"Q All right, where did you park your automobile?
"A Right smack dab in the front of the house.
"Q Broad daylight?
"A Yes, sir.
"Q Did you then go inside?
"A Yes, sir.
 "Q Okay, did you leave your grandmother in the car?
"A Yes, sir.
"Q Did you leave the car running?
"A Yes sir, had the heater on.
"Q I beg your pardon?
"A Left the heater on.
 "Q How long were you inside, Randy, what would you say?
"A Three to five minutes.
 "Q All right, do you remember picking up a newspaper out of the yard?
"A I sure did.
"Q You did pick up a newspaper? *Page 825 
 "A Because I wondered why they threw a paper after my house had burned. I subscribed to the Montgomery paper and I picked it up after I got out of the car.
 "Q Now when you went inside, how long did you say that you were inside? "A Inside, I wasn't inside but about two minutes.
"Q Did you remove anything from the premises?
"A Yes, I did.
"Q What did you remove?
"A My picture book.
". . . .
 "A All right, this truck, were there some trucks at your house?
"A They were across the street.
"Q What kind of trucks were they?
 "A Gene/Max Barton Moving Service, they had just moved that house to put the bank up and they actually moved the house, I think, the day before. But they were there getting the rest of the bricks and things.
"Q Were there any fire trucks there?
"A One of his trucks has got a light on top of it.
"Q Were there any fire trucks there?
"A No.
"Q Were there any police cars there?
 "A I have got a police car, or X-police car, but I don't know if there was one there or not.
 "Q Now when you were inside did you notice any smoke or any fire inside?
"A None whatsoever.
 "Q When you left did you notice any smoke or fire inside?
"A No, sir.
"Q Did you start any fire inside the house?
"A No, sir, I did not.
". . . .
 "Q Where did you go after you left there [the hospital]?
"A I took her home.
"Q Took who home?
 "A My grandmother. And we took our plates in and warmed them up. I laid down on the couch and took a nap and left about 3:00.
 "Q Where did you receive this call from Treadaway and Costa that day about this fire, the second fire?
 "A I left grandmother's around three and I went over to my mother's house over in Bellwood. And it was late in the afternoon but it was already dark."
 I
Appellant urges that the trial court erred in denying "Defendant's Motion to Suppress all the evidence produced by the warrantless search." He relies on Michigan v. Clifford,464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), which held that a search warrant is required if the primary object of the search is to gather evidence of criminal activity rather than to determine the cause and origin of the fire. Here, the primary object of the investigation and search of the premises immediately after the call to the premises on December 19 and thereafter on December 22, was to determine the cause and origin of the fire, not to gather evidence of criminal activity.
 II
Appellant next contends that since he was charged with having set the second fire, evidence regarding the first fire was not admissible. "A previous effort of the accused to procure the burning of the building described in the indictment has been held admissible in an arson charge. This admission of a prior criminal act involves a plan or design exception to the general exclusionary rule as well as the motive exception." C. Gamble,McElroy's Alabama Evidence § 70.01(1) (3d ed. 1977).
 III
The appellant contends the trial court erred "in allowing the State to impeach its own witness over the objections of the Defendant." During the direct examination of Ms. Ruth Henderson, who lived next door to Randy Franklin, the prosecuting attorney attempted to refresh *Page 826 
the recollection of the witness by using her written statement. The prosecuting attorney handed the witness a copy of the statement, which she acknowledged as her statement made in her handwriting. Her testimony on direct examination ended as follows:
 "A Well I remember making a statement but I don't remember putting that time. Some of it I can't remember.
 "Q How about the amount of time, do you remember that?
 "A No, sir. Well I was sick with the flu, couldn't hear and nervous from that other fire. I just can't . . .
"THE COURT: You have anything else?
 "MR. LANIER: No, sir. Mr. Taylor [defense attorney] may have a question or two.
 "MR. TAYLOR: No, sir. "THE COURT: You may come down."
The handwritten statement was not offered in evidence. Without it, we are unable to conclude whether or not the state attempted to impeach the witness by a prior inconsistent statement. We are of the opinion that the trial court was correct in its ruling that the state was endeavoring merely to refresh the recollection of the witness and not to impeach her.
 IV
Next, appellant contends that the trial court erred in not granting his motion for a mistrial during summation. The following occurred:
 "MR. LANIER: They brought a witness up that put somebody in the house. Lawyer Taylor has only been practicing law for six years but he has learned one of the oldest tricks in the book. Because he is hired —
 "MR. TAYLOR: Your Honor, I am going to object to that and move for a mistrial. That is highly irregular and unethical for him to assume that I would bring somebody up here to tell a lie to this jury.
 "THE COURT: I would sustain the objection to that and caution you Mr. Lanier. Let's stay within the framework of the evidence and reasonable inferences therefrom and you will not consider that ladies and gentlemen."
The argument by counsel for the state quoted above came dangerously close to prejudicial argument of an ineradicable nature that would justify a mistrial. Nevertheless, in the light of the prompt reproof by the trial judge in his instruction to the jury, we are unable to determine that the court committed reversible error in not granting appellant's motion for a mistrial.
 V
Appellant also contends that the trial court erred in giving the "dynamite charge" to the jury. About thirty minutes after the case had been submitted to the jury, they returned for further instructions, and the trial judge again charged them on the law of circumstantial evidence. He then stated to the jury the following.
 "Now I realize that it is hot and I don't want to punish anybody. But in view of the expense that is involved to everybody in trying one of these cases we would like for you and urge you to go back and reason together. We don't want anybody to compromise an honest conviction. But by the same token, we would like you to examine your position and make sure that you are not arbitrary.
 "So go back and examine the evidence a little while and see if you reach a verdict in this case to avoid the expense and necessity of retrying it. The evidence has been presented. Somebody is going to have to decide it some day. There is not going to be anything different in another trial. And [no] other twelve people are going to have any more judgment or any more common sense than y'all have got. So go back and see if you can get together because it will have to be decided at some point in time."
At this point, at 5:30 p.m., the jury left to recommence their deliberations, and the following objection was made by defense counsel:
 "MR. TAYLOR: For the record we would enter our objection of what we consider a dynamite charge in this case. Inasmuch as we believe that the Court *Page 827 
 was informed that the jury was locked eleven to one to convict and that we think that the charge that was given to the jury as they were brought back in was highly prejudicial to the defense. And could ultimately lead to a conviction of the Defendant by changing the minds of any number of jurors that might otherwise might have a reasonable doubt as to my client's innocence in this case."
The jury returned to the courtroom at 5:50 p.m. with a verdict of guilty of arson in the second degree.
The term "dynamite charge" has often been used interchangeably with the expression "Allen charge," which is derived from Allen v. United States, 164 U.S. 492,17 S.Ct. 154, 41 L.Ed. 598 (1896). In Allen, the Supreme Court set forth the principles that govern the question whether a trial court's instructions encouraging a jury to arrive at a unanimous verdict exceeded the bounds of permissible instructions by coercing the jury into reaching a unanimous verdict which the jury would probably not have rendered but for such coercion. In our opinion, the instruction of the trial court in the instant case does not come within the category of a coercive instruction and was not error prejudicial to the appellant.
 VI
Finally, appellant argues that the court erred in not granting the "Motion for Judgment of Acquittal Notwithstanding the Verdict or in the Alternative, For a New Trial." As grounds, he contends that:
 "3. The verdict of the Jury is contrary to the great preponderance of the evidence in this case.
 "4. The verdict of the Jury was contrary to the evidence and the law in this case."
There was substantial evidence that appellant Franklin was guilty of intentionally setting fire to the building on December 22. Mr. Clarence L. Steele of the Andalusia Fire Department testified with respect to the second fire, that they received a call and arrived just before noon on the 22nd of December, 1983, three days after the first fire. He said that it only took two or three minutes to extinguish, explaining that "[i]t wasn't, you know, it was a rag and some boards that was stacked up against the chimney, plus it hadn't gotten started good." He testified that the rag had gasoline on it. He described the boards as "1 x 4's or 1 x 6's stacked against the chimney in a tepee style, and they were burning."
Billy F. Treadaway of the Andalusia Police Department testified to the powerful evidence of arson discovered after the second fire. He testified to seeing flames on the mantle when he looked in the window of the house on the morning of the second fire. A newspaper, dated the day of the second fire, was found in the house after the second fire was extinguished. The appellant, in response to questioning after the second fire, stated that he could not be charged because he had not applied for any insurance recovery, information presumably acquired by him in his occupation as a bail bondsman.
Howard Easley of the Andalusia Fire Department testified that he received a dispatch on the day of the second fire and came to the house. He saw smoke coming out of the roof around the chimney area and he peered in through the dining room window and saw flames around the mantle of the fireplace and above the mantle. The fire in the living quarters of the house around the mantle was a different fire from the attic fire where the gasoline soaked rag was found adjacent to the boards leaned against the chimney in the shape of a tepee.
Jeff Holland, an Andalusia firefighter, testified that he was the firefighter who got into the attic of the house on the evening of the first fire. He said that he crawled around all over the attic looking for hot spots where the fire might rekindle but did not find any. He testified that there were no boards stacked up against the chimney after they had extinguished the first fire on the night of the 19th. He testified that the roof was not burned out after the first fire, nor was the attic.
Mrs. Ruth Henderson, who lived next door to the premises in question, observed *Page 828 
the appellant in the premises before the fire started. She saw him go into the house with a newspaper in his hand, and then she saw him come out with a paper sack and re-enter the house with a flashlight in his hand. Then he left again. He did not spend a long time at the house that morning. Franklin, himself, testified that he visited his house on the morning of the second fire.
The jury obviously believed the testimony of the State's witnesses and disbelieved some of the testimony of the appellant's witnesses. There was sufficient evidence upon which the jury might be convinced beyond a reasonable doubt of appellant's guilt. We are not a jury. We will not substitute ourselves for a jury. The court did not err in denying appellant's motion for a new trial on the ground that the verdict was contrary to the weight of the evidence.
We have considered the other contentions of the appellant but find them without merit. This case is due to be affirmed.
AFFIRMED.
All the Judges concur.