The appellant, Glenn McGilberry, was convicted of sexual abuse in the first degree, in violation of § 13A-6-66, Code ofAlabama (1975), and sentenced to a term of two years; he was to serve twelve months in the Mobile County Jail, with the balance of the sentence suspended for a five-year period.
 I
The appellant argues that the trial court's administering of an Allen charge to the jury under the circumstances of this case was impermissibly coercive. The record indicates that on December 15, 1986, the jury began deliberations at 4:15 p.m. At 5:05 p.m., the jury had not yet reached a verdict and the trial court declared a recess until the following morning. The jury continued deliberations at 9:00 a.m. on December 16, 1986. At 10:50 a.m., the foreman informed the trial court that the jury was unable to reach a unanimous decision. The trial court gave the following charge:
 "Well, have a seat. Let me talk with you all about that. And let me say this to you all up front: That we are not going to keep any of you here. We are not going to keep you here to irritate you or to put you under pressure. We are not going to do that. But I want to discuss with you the significance of failing to reach a verdict. When you all were impanelled, I was quite excited about the composition of the jury because you look like an excellent jury. During the course of the trial, you proved to be an excellent jury. . . . You all have invested a day, a little bit more than a day in this case and have done it well. If we have to re-try this case, I don't know that I could get a jury as fine as this one. And if we don't get a jury as fine as this one, then the product of the deliberations would not be as fair and the product of the deliberations that you all can perform in this case. And the wonderful work that you have done so far would be wasted, I mean utterly wasted. That would be a real shame. That would be kind of a blow to the parties in this case and a blow to our system of trying to resolve conflicts by having a trial of impartial people. Now, I am going to talk to you a little bit about unanimous verdicts. As I have said, your verdict does have to be unanimous and I don't want for anything that I say in this case to detract from the law which is that for you to find the defendant guilty, each and every one of you must be convinced beyond a reasonable doubt and to a moral certainty of his guilt. That is true. And, likewise, to find him not guilty each and every one of you must harbor a reasonable doubt as to his guilt. That is true. But when we speak of proof beyond a reasonable doubt and when we speak of reasonable doubt, we mean not doubt on a personal — We mean not your being convinced or your harboring a doubt on a — measured by a personal standard, but rather measured by an objective standard. In other words, when you are trying to determine whether you harbor a doubt or whether you are convinced beyond a reasonable doubt, the question is not really your personal leanings or predilections. Its how would a fair and reasonable person view the evidence. . . . But remember that none of us are here — that none of you are hearing this case or trying this case really because you want to except insofar as you want to do your duty to your community. You are hearing this case because we have to hear the case and the judgment you make is not going *Page 909 
to be a happy thing either way. Either way, one side or another is going to be bitterly disappointed and they will either be — One side or the other will either be bitterly disappointed by your verdict or we will have to retry this case with another jury, possibly not nearly as wise and attentive as this one. And then they will have to be bitterly disappointed at that point. One side is going to — the complaining witness's side or the defendant's side — one or the other will win, one or the other will lose. So it's not as if there is going to be an outcome that's happy for everybody at any point in these proceedings. I am going to — I will ask you if you can do it, think about your position and consider reevaluating it against the standard of what would the average, fair, and reasonable person think of the evidence. . . . Another thing that I would like for all of you to bear in mind is this: changing your position is no personal disgrace. In fact, some of the greatest leaders down through history have followed a procedure of decision-making which almost inherently and invariably required them to change position. Some of our greatest leaders, ones that pop into mind right now are Abraham Lincoln, John Kennedy, Dr. Martin Luther King. Those are three I can think of right now who when they were faced with a difficult decision would get their advisors around them, whether they be cabinet members of other advisers. We get their advisors around and would throw out an idea for discussion. The leader, himself, would throw out the idea for discussion and let his advisors just tear it to pieces. . . . And then the leader would look among all the different thoughts that had been proposed and would pick out the best and frequently would say, 'Well, yeah, the position I originally took did have a lot of flaws. Let's take this other position. It looks like the right one, having considered everything.' And those people became famous for making good decisions, sound decisions. And they got themselves a place in history by virtue of the interesting process by which they would examine an idea, by adopting the wrong one first, tearing it to pieces, and then finding the right one from there. That dynamic process is one that you jurors can use to reach a verdict which will be truly unanimous in the heart of each and every one of you, measured by an objective standard of how the average, reasonable and fair person would view the evidence. Would you all be willing to bear that in mind? I understand Commissioner Mason is under the gun to some extent because he has to go up to Montgomery. I don't want for that pressure to be creating a problem. It might be that we could put you ladies and gentlemen in recess until such time as Commissioner Mason could get back from Montgomery, depending on how long your trip would be, Jim, —
 "JUROR MASON: Judge, I am willing to go back in and see if we can reach an agreement. As far as that goes, I can postpone it. I am not under that much pressure to go. So, I would like to try to resolve this.
 "THE COURT: We are deeply grateful for your service on the jury and for your service as a commissioner and we want to fit the two together compatibly if we can. If you all find you are making progress and you also find you are under time constraints with regard to your trip, as I say, if need be, we can put the jury into recess for a day or two so that you could run up and do that. Would all of you be willing to take a fresh look at the case and each one of you evaluating your position and see if you can reach a unanimous verdict. Is there anybody that thinks it wouldn't be a good idea to do that?"
Thereafter the defense counsel objected and took exception to the trial court's reference to Commissioner Mason and his personal business "with time constraints" in that such might "put undue pressure on the jury to compromise even further possibly to the detriment of the defendant." At 11:05 a.m., approximately five minutes later, the jury returned with a verdict of guilty. *Page 910 
The propriety of the trial judge's inquiry and statements concerning the particular jury member should be determined under a "totality of the circumstances" test. Ex parte Showers,407 So.2d 169 (Ala. 1981).
 " 'While the trial judge is vested with large discretion in the conduct of the trial and may admonish the jury as to the desirability and importance in agreeing on a verdict, he may also urge jurors to make every effort consistent with their consciences to reach such verdict. He may request jurors to lay aside mere pride of judgment and listen to what the other jurors believe from the evidence. The judge may ask the jurors to reason together in a spirit of fairness and candor and, if possible, harmonize them. However, it is not proper to give an instruction censoring jurors for not agreeing with the majority.' "
Richardson v. State, 508 So.2d 289 (Ala.Cr.App. 1987), quotingShowers v. State, 407 So.2d 167, 169 (Ala.Cr.App. 1980), reversed on other grounds, 407 So.2d 169 (Ala. 1981).
 " ' "It is quite clear that under Alabama law a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used." Showers v. State, 407 So.2d 169, 171 (Ala. 1981).' " Harris v. State, [Ms. 6 Div. 176, April 28, 1987] (Ala.Cr.App. 1987), quoting Channell v. State, 477 So.2d 522, 531 (Ala.Cr.App. 1985).
In the present case, the numerical division of the jury was never indicated in the record. Harris v. State, supra slip at 7. Furthermore, the trial court did not indicate to the jury through words or conduct that it "expected" a verdict. Channellv. State, supra at 531; Orr v. State, 40 Ala. App. 45,111 So.2d 627 (1958), affirmed, 269 Ala. 176, 111 So.2d 639 (1959). While it is true that the verdict was returned very soon following the trial court's comments concerning the jury member, Gidley v. State, 19 Ala. App. 113, 95 So. 330, 331
(1923), under the totality of the circumstances of the judge's charge, we do not find that the "trial court's instructions encouraging [the] jury to arrive at a unanimous verdict exceeded the bounds of permissible instructions by coercing the jury into reaching a unanimous verdict which the jury would probably not have rendered but for such coercion." Franklin v.State, 502 So.2d 821, 827 (Ala.Cr.App. 1986), cert. quashed,502 So.2d 828 (Ala. 1987).
Moreover, we note that the case sub judice is distinguishable from Ex parte Morris, 465 So.2d 1180 (Ala. 1985). In Morris, the judge ended his remarks in sending the jurors back for further deliberations by stating "that he would be back by 5:00 that afternoon." The Court found that this statement "clearly put within the minds of the jurors a deadline for returning with an unanimous verdict. There can be no doubt that, at this point, [the judge's] 'words and deeds' had crossed the 'Allen
line' and Petitioner's motion for a mistrial should have been granted." Ex parte Morris, supra, at 1183. In the present case, no such deadline was set, as the trial court explained that the jury could recess for a few days in order for the jury member to conduct his business.
For the above-stated reasons, we do not believe that the trial judge's comments constituted reversible error.
 II
The appellant argues that the trial court abused its discretion by allowing a witness to testify after she violated the rule of sequestration. The record indicates that, following the testimony of the victim, a recess was called during which the trial court held a conference in his chambers with both attorneys. The trial court explained:
 "I just went out in the hall to get a drink of water and the complaining witness, what's her name, . . . was sitting between her parents. They all had their three heads together talking about something. And as I came out the door, she said to both of them, 'Shush.' I have a feeling that all three of them were discussing the case." *Page 911 
Thereafter, the victim's father was called to the judge's chambers. When the trial court questioned the victim's father, concerning the incident, he responded that they were not discussing the case, but rather a fishing trip or his purchase of "a big rod and reel." The victim's mother was then called into chambers. The following transpired:
 "THE COURT: . . . [W]hat were you all discussing when I came out the door to get a drink of water?
 "[THE MOTHER]: [My daughter] was saying you better get all the water you want before you get in there because you can't have any. Your mouth feels like a cotton ball. And her daddy said, 'If you want water, all you have to do is say, I want water.' She said, 'Uh uh.'
"THE COURT: Did you all discuss anything else?
"[THE MOTHER]: No.
"THE COURT: Nothing at all?
 "[THE MOTHER]: Not that I can remember. As far as the case is concerned?
"THE COURT: Uh-huh.
"[THE MOTHER]: No.
"THE COURT: Well, what were you discussing?
 "[THE MOTHER]: That's what I said, the water. That's the only thing I can think of.
 "THE COURT: You mean for the last 15 minutes you all only discussed a thing?
 "[THE MOTHER]: Well, we were talking about them going to Switzerland this summer.
 "THE COURT: How long had the three of you been sitting there talking?
 "[THE MOTHER]: We had just sat down because he had brought [my daughter] back out there.
 "[PROSECUTOR]: Judge, I brought her out there. I didn't want her sitting in there until Your Honor was ready.
"THE COURT: Anything further?
"[DEFENSE COUNSEL]: No."
The victim was then called to the judge's chambers. The victim stated that they were discussing softball and a trip to Switzerland for a softball tournament. She stated that they had been talking for approximately five minutes before the judge walked out into the hall. The following then transpired:
 "THE COURT: . . . When I came out there in the hall, how come you said, 'Shush?'
 "[VICTIM]: I didn't feel you wanted to hear our conversation.
 "THE COURT: . . . Somebody is not telling the truth. Your father came in here and said y'all had been discussing fishing. You come in here and tell me Switzerland. Nothing would really merit — I mean discussing Switzerland or fishing would provoke your saying 'Shush.' What really were you all talking about?
"[VICTIM]: That is what we were talking about.
"THE COURT: Not talking about fishing?
 "[VICTIM]: I wasn't talking about fishing. I was talking Switzerland.
"THE COURT: Was anybody talking about fishing?
"[VICTIM]: No, sir.
". . .
 "[PROSECUTOR]: When you [victim] said 'Shush,' were you trying to hide anything from the Judge?
"[VICTIM]: No, sir.
"[PROSECUTOR]: Why were you saying 'Shush'?
 "[VICTIM]: They were too loud. "[PROSECUTOR]: Was it out of respect for the judge?
 "THE COURT: Don't lead her into that, Buz. Somebody is lying through their teeth. I am sorry I didn't put them all under oath before I called them back here. They were murmuring very softly. They were not too loud. And somebody is just lying through his or her teeth. I don't know who it is or what the purpose of it is.
"[PROSECUTOR]: Judge, may I ask her —
"THE COURT: Uh huh.
 "[PROSECUTOR]: Were you talking about the testimony in this case?
"[VICTIM]: No, sir. *Page 912 
 "[PROSECUTOR]: Were you talking to your parents, telling them what to say or telling them what you said?
"[VICTIM]: No, sir.
 "[PROSECUTOR]: Judge, whatever they were talking about, I am confident they were not trying to hinder the court process. I have a great deal of respect for this family. For whatever reason the [victim] said, 'Shush,' she is only 17 years old. I am sure she is not trying to hide anything. Her mother is very incidental as far as her testimony, very little to say. Her father's testimony is very limited. She is, obviously, the main witness, and she has already testified. I just want to be on the record.
". . .
 "[PROSECUTOR]: Again for the record, I had her sitting beside me in the courtroom. I wanted her to sit with her family until Your Honor took the bench. I didn't want to leave her there by herself. That is why she was outside at all."
Thereafter, the father was again brought to the judge's chambers, where he was placed under oath. He explained that when the judge had questioned him concerning their topic of conversation, his mind "just went that blank." He then stated that they had been discussing the trip to Switzerland and never discussed fishing. The trial court then stated:
 "[PROSECUTOR], We don't need this quality of testimony in this trial. Now, this witness — I don't know what the situation with him is, but if [defense counsel] objects to his testifying, I am not going to have him testify. I have the feeling that somebody has been violating the rule of sequestration. I have gotten two different stories out of this witness, one under oath, one not under oath. And the rule has got to mean something."
The defense counsel then objected to allowing the mother to testify, but the trial court overruled the objection, noting that there had been no conflict in what she had said. The defense counsel then reminded the trial court that the mother had testified that they had been talking "about a drink of water" and that initially that was all that she could recall. The trial court then responded, "I have some misgivings about the whole business." Thereafter, although the father was not allowed to testify, the mother was allowed to take the stand. The mother testified that on Friday she drove her daughter to the father's home, where she was to spend the weekend. The appellant lived near the victim's father, and it was the following Sunday afternoon that the alleged offense occurred. The mother testified that on Friday when she dropped her daughter off at the father's house, there were no marks on the victim's neck. However, when she returned to drive the victim home on Monday morning, she said there was "a passion mark" on the victim's neck. She testified that after she spoke to the victim, she drove to the Sheriff's Department and signed a warrant for the appellant's arrest.
Although there was a definite appearance of impropriety on the part of the victim and her parents, and although the trial judge noted that he had "some misgivings about the whole business," this matter lies largely within the trial court's discretion.
 "The general rule in Alabama is that the invocation and enforcement of the rule of exclusion of witnesses is a matter within the sound discretion of the trial court and is not normally subject to appellate review. Stone v. State, 55 Ala. App. 663, 318 So.2d 359 (1975); Patterson v. State, 53 Ala. App. 567, 302 So.2d 540, cert. denied, 293 Ala. 770, 302 So.2d 545 (1974); Gamble, McElroy's Alabama Evidence, § 286.01 (3d ed. 1977).
". . .
 "Because appellate judges cannot observe the demeanor of the parties at trial nor hear the inflection of their voices, the determination of whether the [party] was at fault rests in the discretion of the trial court, and is not subject to appellate review in the absence of clear abuse. Johnson v. State, 8 Ala. App. 14, 62 So. 450, rev'd on other grounds, 183 Ala. 88, 63 So. 73 (1913)." *Page 913 
Chatman v. State, 380 So.2d 351, 353 (Ala.Cr.App. 1980). See also Averitte v. State, 384 So.2d 1245, 1247 (Ala.Cr.App. 1980).
 "As was recognized in Degg [v. State], 150 Ala. 3, 43 So. 484 (1907), it is well settled in this state that the question of whether a witness who has violated a sequestration order may thereafter testify is a matter which lies within the sound discretion of the trial judge. See also Stephens v. State, 250 Ala. 123, 33 So.2d 245 (1947); State v. Brookshire, 2 Ala. 303 (1841)." Ex parte Faircloth, 471 So.2d 493, 496 (Ala. 1985).
"The purpose of sequestration is to obviate as far as possible one witness's trying to make his testimony consistent with that of another." Young v. State, 416 So.2d 1109, 1111
(Ala.Cr.App. 1982) citing Carpenter v. State, 400 So.2d 417,423 (Ala.Cr.App.), cert. denied, 400 So.2d 427 (Ala. 1981);Rowell v. State, 53 Ala. App. 286, 299 So.2d 332 (1974).
 "The purpose of the witness sequestration rule is to prevent any one witness from hearing the testimony of other witnesses and perhaps perceiving the value of his own testimony to one party or the other. Obviously, if witnesses are sequestered, they are not able to 'strengthen or color their own testimony, or to testify to greater advantage in line with their bias, or to have their memories refreshed — sometimes unduly — by hearing the testimony of other witnesses.' Louisville and Nashville R.R. Co. v. York, 128 Ala. 305, 310, 30 So. 676, 678 (1901)." Ex parte Faircloth, supra, at 496.
We note that this is not a situation in which the defendant's witnesses were not allowed to testify because of a violation of the rule and thus his constitutional right to call witnesses is not at issue. Cf. Ex parte Faircloth, supra; Chatman v. State, supra;
Furthermore, because of the close relationship of the victim to her family, it is normal to expect that "each should be fully aware of what testimony the other plans to give."Cowgill v. State, 426 So.2d 517, 521 (Ala.Cr.App. 1982) (wherein a wife and husband were victims of a crime and the wife remained in the courtroom during the reception of the husband's testimony, in violation of the rule).
We find that the trial judge did not abuse his discretion in allowing the victim's mother to testify.
 III
The appellant argues that the trial court erred in disallowing evidence concerning the victim's "interest in and propensity for seeking affection from older men." The appellant argues that this evidence was clearly relevant and material to his theory of defense. The trial court ruled that if such evidence was indeed relevant, it was banned by the rape shield law, § 12-21-203, Code of Alabama (1975).
This statute states in pertinent part:
 "(b) In any prosecution for criminal sexual conduct or for assault with intent to commit, attempt to commit or conspiracy to commit criminal sexual conduct, evidence relating to the past sexual behavior of the complaining witness, as defined in subsection (a) of this section, shall not be admissible, either as direct evidence or on cross-examination of the complaining witness or of other witnesses, except as otherwise provided in this section.
 "(c) In any prosecution for criminal sexual conduct, evidence relating to the past sexual behavior of the complaining witness shall be introduced if the court, following the procedure described in subsection (d) of this section, finds that such past sexual behavior directly involved the participation of the accused."
This section has been found constitutional. Darrow v. State,451 So.2d 394 (Ala.Cr.App. 1984). Under the rape shield statute, although evidence of past sexual behavior of the victim directly involving the participation of the accused may be considered by the jury as bearing on the issue of consent,Wooten v. State, 361 So.2d 1192 (Ala.Cr.App. 1978), "evidence of particular acts of unchastity on the part of the victim *Page 914 
with a third person are not admissible. Hollis v. State,380 So.2d 409 (Ala.Cr.App. 1980)." Moseley v. State, 448 So.2d 450,454-55 (Ala.Cr.App. 1984). "Evidence of sexual activity between the complaining witness and third persons is immaterial and irrelevant." Smiley v. State, 435 So.2d 202, 206 (Ala.Cr.App. 1983).
AFFIRMED.
All the Judges concur.